# Supreme Court of Florida

_____

No. SC13-2105
_____

**ASKARI ABDULLAH MUHAMMAD f/k/a THOMAS KNIGHT,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[December 19, 2013]
**<u>CORRECTED OPINION</u>**

PER CURIAM.

Askari Abdullah Muhammad f/k/a Thomas Knight,[1] a prisoner under

sentence of death, appeals from the denial of his successive motion for

postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.851.

We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Muhammad filed the

instant successive postconviction proceeding after Governor Rick Scott signed a

death warrant on October 21, 2013. For the reasons set forth below, we affirm the

---

1. Muhammad's original name was Thomas Knight. While imprisoned,
Knight adopted the new name of Askari Abdullah Muhammad for primarily
religious reasons. See <u>Muhammad v. State</u>, 494 So. 2d 969, 970 n.1 (Fla. 1986),
<u>cert. denied</u>, 479 U.S. 1101 (1987). We refer to him herein as Muhammad.

circuit court's order denying postconviction relief on the claims raised in his successive postconviction motion, but we reverse the court's order denying Muhammad's public records request to the Florida Department of Corrections (DOC) for copies of his own inmate and medical records, and we order immediate transmission of copies of those records to Muhammad's counsel.

## BACKGROUND

Muhammad was convicted of the October 12, 1980, first-degree murder of correctional officer James Burke. Burke was fatally stabbed by Muhammad while he was incarcerated on death row for the murder of a Miami couple.[2] Burke was routinely taking death row inmates to be showered and, when he unlocked Muhammad's cell, Muhammad attacked him with a knife made from a sharpened spoon. Burke died after suffering more than a dozen wounds. It was reported that Muhammad became upset when he was not allowed to see a visitor because he had refused to shave without a special exemption. Muhammad was heard to say he would have to start "sticking people." See Muhammad v. State, 494 So. 2d 969, 970 (Fla. 1986), cert. denied, 479 U.S. 1101 (1987).

---

2. When the murder of Burke occurred, Muhammad was on death row pursuant to two death sentences for the murders of Lillian Gans and Sydney Gans. See Knight v. State, 746 So. 2d 423, 426 (Fla. 1998) (affirming death sentences imposed upon resentencing ordered by a federal appeals court); see also Knight v. State, 338 So. 2d 201, 205 (Fla. 1976) (affirming convictions and sentences).

In 1981, prior to trial, Muhammad's counsel obtained appointment of two mental health experts to examine him as to competence, but he consistently refused to cooperate with them. The court later added a third competency expert, psychiatrist Jamil Amin, M.D., who was originally appointed as a defense advisor but was later appointed to act as a competency expert. Muhammad did meet with Dr. Amin and, based on an opinion from him that Muhammad was suffering from a schizophreniform illness but was competent to stand trial, the trial court adjudged Muhammad competent to proceed.

Muhammad sought to represent himself at trial but his request to proceed pro se was denied by the first judge assigned to the case. After a second judge was assigned to the case, Muhammad again asked to represent himself, but was denied. The case proceeded to trial but ended in a mistrial. That trial judge subsequently recused himself and Muhammad then proceeded to a second trial. He again sought to represent himself and the successor judge allowed him to appear pro se with standby counsel. Muhammad was convicted and waived a jury recommendation in the penalty phase. The trial court found nothing in mitigation, and found three aggravating factors: (1) the defendant was under a sentence of imprisonment, § 921.141(5)(a), Fla. Stat. (1979); (2) the defendant had been convicted of a prior capital felony, § 921.141(5)(b), Fla. Stat.; and (3) the murder was especially heinous, atrocious, or cruel, § 921.141(5)(h), Fla. Stat. Muhammad was sentenced

to death and this Court affirmed both the conviction and the sentence in

Muhammad v. State, 494 So. 2d at 976.[3]

Muhammad filed an initial postconviction motion under Florida Rule of

Criminal Procedure 3.850, raising eighteen claims. Relief was denied and

Muhammad appealed the denial of fifteen claims.[4] On appeal, this Court affirmed

---

3. The claims on direct appeal were: (1) the trial court erred in finding Muhammad competent without sufficient facts; (2) the trial court erred in allowing him to represent himself without first determining competency to waive counsel and to represent himself; (3) the trial court erred in preventing him from presenting evidence of insanity because he refused to be examined, in violation of his constitutional rights; (4) the trial court erred in finding as aggravating factors that Muhammad was under a sentence of imprisonment when he committed the murder and that he had a conviction for a prior felony; and (5) the trial court erred in failing to consider Muhammad's mental status in mitigation.

4. The claims appealed after denial of the initial postconviction motion were: (1) summary denial was erroneous; (2) a reliable transcript and critical records were not included in the record on appeal; (3) Muhammad was denied effective assistance of counsel in violation of Faretta v. California, 422 U.S. 806 (1975); (4) Muhammad's constitutional rights were violated when the appointed mental health expert failed to conduct a competent evaluation, causing counsel to render ineffective assistance; (5) Muhammad was denied effective assistance of counsel when defense counsel was ordered not to present an insanity defense; (6) Muhammad was tried while not legally competent; (7) the death sentence was unreliable because Muhammad was not competent to waive his sentencing jury, and no advisory jury was employed; (8) Muhammad was denied his rights as a pro se defendant at both phases of the trial; (9) State misconduct violated Muhammad's right to a fundamentally fair and reliable trial and sentencing; (10) the trial court's denial of Muhammad's motions for change of venue and for individual voir dire deprived him of his right to a fair and impartial jury; (11) Muhammad was indicted by a biased grand jury; (12) the trial court erred in failing to consider Muhammad's mental deficiencies as mitigating circumstances and in considering nonstatutory aggravating factors; (13) the trial court unconstitutionally shifted the burden of proof with regard to the appropriateness of

summary denial of most of the claims as procedurally barred. <u>Muhammad v. State</u>, 603 So. 2d 488, 489 (Fla. 1992). However, we reversed summary denial of the claim that the State failed to disclose exculpatory statements concerning Muhammad's mental state at the time of the crime in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and remanded for an evidentiary hearing. <u>Muhammad</u>, 603 So. 2d at 489-90.

On remand to the circuit court, and after an evidentiary hearing, the trial court vacated Muhammad's death sentence and ordered a new sentencing hearing. The State appealed the grant of a new sentencing hearing and Muhammad cross-appealed the claim that the trial court failed to consider the impact of the evidence presented at the evidentiary hearing on the guilt phase of his trial. <u>See</u> <u>State v. Knight</u>, 866 So. 2d 1195 (Fla. 2003). We affirmed the portion of the trial court's order denying the motion to vacate Muhammad's conviction, but reversed that portion of the order vacating his death sentence. <u>Id.</u> at 1210. In reversing the order granting a new penalty phase, we concluded that even if Muhammad had clearly proven that certain employee and inmate statements from the DOC investigatory

a life sentence; (14) the jury and judge improperly considered certain "victim impact" information; and (15) the "heinous, atrocious, or cruel" aggravating circumstance was applied in violation of <u>Maynard v. Cartwright</u>, 486 U.S. 356 (1988). Muhammad combined and rearranged some of his claims on appeal, and did not appeal his claims that the trial court failed to apply the law of the case and collateral estoppel. <u>See</u> <u>Muhammad</u>, 603 So. 2d at 488-89 & n.1.

file were willfully or inadvertently withheld, Muhammad failed to prove that he was prejudiced by the alleged suppression. The seven unattributed, unsigned, and undated statements contained limited and conflicting information concerning Muhammad's state of mind around the time of the murder, and they were cumulative to information in employee depositions that were turned over to Muhammad, but which he did not attempt to use to present any mitigation.[5] Id. at 1200-02. We also denied Muhammad's petition for writ of habeas corpus alleging five claims of ineffective assistance of appellate counsel.[6] Id. at 1203 & n.9. The Supreme Court denied certiorari review in Muhammad v. Florida, 541 U.S. 1066 (2004).

---

5. While the case was on remand, Muhammad moved for a determination of competency and the court appointed two experts on February 10, 1999. He was found to be competent by one of the experts, but the record does not contain the report of the second expert or an order of the court on the issue. See Muhammad v. McDonough, No. 3:05-CV-62-J-32, 2008 WL 818812, *7 (M.D. Fla. Mar. 26, 2008), certificate of appealability denied, 554 F.3d 949 (11th Cir. (Fla.) 2009), cert. denied, 559 U.S. 906 (2010).

6. The claims of ineffective assistance of appellate counsel were: (1) failure to appeal the claim that the trial court instructed standby counsel not to assist Muhammad; (2) failure to appeal the claim that Muhammad was not present at critical stages of the proceedings, and the trial court engaged in ex parte communications with the State; (3) failure to appeal denial of meaningful access to the law library to prepare defenses; (4) failure to appeal the trial court's denial of change of venue and sequestered, individual voir dire, thus denying a fair and impartial jury; and (5) failure to appeal the claim that Muhammad was unconstitutionally indicted by a biased grand jury. See Knight, 866 So. 2d at 1203 n.9.

In 2005, Muhammad filed a petition for writ of habeas corpus in the federal district court alleging ten claims.[7] Muhammad v. McDonough, No. 3:05-CV-62-J-32, 2008 WL 818812, *1-2 (M.D. Fla. Mar. 26, 2008).  The federal court denied an evidentiary hearing on the claims, id. at *8, *22, and denied habeas corpus relief.  Id. at *48.  Muhammad sought a certificate of appealability from the Eleventh Circuit Court of Appeals on five of the grounds previously pursued in the state

---

7.  The claims filed in federal district court were: (1) Muhammad's constitutional rights were violated because he was forced to undergo criminal justice proceedings although he was not legally competent; (2) he was denied the assistance of counsel (with four subclaims); (3) his constitutional rights were violated and he was denied effective assistance of counsel when the court ordered his defense counsel not to present an insanity defense; (4) he was denied his rights as a pro se defendant in violation of the Constitution (with eight subclaims); (5) the State's misconduct throughout the proceedings denied him his rights to a fundamentally fair and reliable capital trial and sentencing guaranteed by the United States Constitution (with three subclaims); (6) his death sentence is not reliable because he was not competent to waive his sentencing jury, the trial court failed to conduct the penalty phase before a sentencing jury, and the resulting sentence violates the Constitution; (7) the trial court erred by failing to consider his mental deficiencies as nonstatutory mitigation and erred in considering nonstatutory aggravating factors in violation of the Constitution; (8) he was deprived of his constitutional rights because the mental health expert retained to evaluate him before trial failed to conduct a professionally competent and appropriate evaluation, and the State's failure to disclose crucial information caused defense counsel to render ineffective assistance, thus depriving him of a fair, individualized, and reliable sentencing proceeding (with three subclaims); (9) the trial court's failure to grant his motions for change of venue and for individualized sequestered jury voir dire deprived him of his constitutional right to a fair and impartial jury; and (10) his constitutional rights were violated because no reliable transcript of his capital trial exists and critical records were not included in the record on appeal.

courts and federal district court.[8]  The Eleventh Circuit denied a certificate of appealability in Muhammad v. Secretary, Department of Corrections, et al., 554 F.3d 949, 955 (11th Cir. 2009), cert. denied, 559 U.S. 906 (2010), holding that Muhammad failed to show the denial of a constitutional right in connection with any of the claims for which he sought the certificate of appealability.

On July 28, 2008, Muhammad filed a successive motion for postconviction relief in the state circuit court under Florida Rule of Criminal Procedure 3.851, raising only one claim, a challenge to the constitutionality of Florida's lethal injection procedures which were in effect on that date.  Muhammad contended that the lethal injection procedures created a risk of unnecessary pain and did not call for a medical determination of unconsciousness, which violated the Eighth Amendment to the United States Constitution and article I, section 17, of the Florida Constitution.  Muhammad sought an evidentiary hearing to present testimony of certain DOC personnel and an anesthesiologist who served on the Governor's Commission on Administration of Lethal Injection, which was created

---

8. The five grounds for which he sought a certificate of appealability were: (1) he was not competent to stand trial; (2) his rights under Faretta, 422 U.S. 806, were violated; (3) the trial court abused its discretion when it ruled that he could not present evidence of insanity; (4) the State interfered with his right to consult with counsel; and (5) he was denied his right to evidence under Brady v. Maryland, 373 U.S. 83 (1963).  See Muhammad v. Sec'y, Dep't. of Corr., 554 F.3d 949, 953 (11th Cir. 2009).

after the execution of Angel Diaz in 2006. The circuit court summarily denied the claim without an evidentiary hearing.

On appeal, we affirmed, noting that Muhammad was raising the same claims and proposing essentially the same evidence that was presented in earlier proceedings in which we held the same lethal injection procedures to be constitutional. See Muhammad v. State, 22 So. 3d 538, 2009 WL 3807205 at *1 (Fla. 2009) (table) (citing Tompkins v. State, 994 So. 2d 1072, 1080 (Fla. 2008), cert. denied, 555 U.S. 1161 (2009); Marek v. State, 8 So. 3d 1123, 1130 (Fla.), cert. denied, 557 U.S. 960 (2009)). We further stated, "The Court has also repeatedly rejected Eighth Amendment challenges to Florida's August 2007 revised lethal injection protocol." Muhammad, 22 So. 3d 538, 2009 WL 3807205 at *2 (citing Ventura v. State, 2 So. 3d 194, 198 (Fla.), cert. denied, 129 S. Ct. 2839 (2009); Henyard v. State, 992 So. 2d 120, 130 (Fla.), cert. denied, 129 S. Ct. 28 (2008); Lightbourne v. McCollum, 969 So. 2d 326, 334, 353 (Fla. 2007), cert. denied, 128 S. Ct. 2485 (2008)).

With this background in mind, we turn to Muhammad's successive motion for postconviction relief filed in the circuit court after Governor Scott signed the death warrant in this case on October 21, 2013. Pursuant to the circuit court's scheduling order, on October 29, 2013, Muhammad filed a successive motion to vacate his judgments of conviction and sentence of death in which he raised seven

claims.[9] Muhammad also filed motions for disclosure of public records, discovery, and for a stay. The State filed responses to the motions and to the postconviction claims and, on October 31, 2013, the circuit court held a combined motion hearing and case management conference. The court denied the motions and issued a written order summarily denying the postconviction claims on November 4, 2013. Notice of appeal was timely filed.

9. The postconviction claims raised in the circuit court in this proceeding were: (1) Muhammad is being denied his rights to due process and equal protection as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Florida Constitution because access to the files and records pertaining to his case in the possession of certain state agencies have been withheld in violation of chapter 119, Florida Statutes, and Fla. R. Crim. P. 3.852; (2) the current, revised procedure that the State of Florida utilizes for lethal injection using midazolam hydrochloride as the first drug constitutes cruel and unusual punishment in violation of article I, section 17, of the Florida Constitution and the Eighth Amendment to the United States Constitution; (3) use of the current three-drug lethal injection procedure, rather than a one-drug lethal injection procedure, creates a substantial risk of serious harm and thus constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution; (4) the clemency process in Muhammad's case was applied in an arbitrary and capricious manner and deprived him of due process in violation of the Eighth and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Florida Constitution; (5) because of the inordinate length of time that Muhammad has spent on death row, adding his execution to that punishment would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and binding norms of international law; (6) portions of the "Timely Justice Act of 2013," chapter 2013-216, Laws of Florida, are unconstitutional because they violate separation of powers in violation of article II, section 3, of the Florida Constitution; and (7) Muhammad is exempt from execution under the Eighth Amendment because he suffers from such severe mental illness that death can never be an appropriate punishment.

A majority of the Court determined that Muhammad's claim as to the substitution of a new drug, midazolam hydrochloride, as the first drug in the three-drug lethal injection protocol warranted an evidentiary hearing. We therefore granted a stay of execution until December 27, 2013, and temporarily relinquished jurisdiction for the purpose of holding an evidentiary hearing on the sole issue of the safety and efficacy of the new drug in the lethal injection procedure.[10] We also directed the DOC to produce correspondence and documents that it had received from the manufacturer of midazolam hydrochloride, including those materials addressing any safety and efficacy issues.

Pursuant to this Court's order, an evidentiary hearing was held on November 21-22, 2013, during which Muhammad presented the testimony of Dr. Mark Heath. The State presented the testimony of Dr. Roswell Lee Evans and Florida Department of Law Enforcement (FDLE) Inspector Jonathan Feltgen. Following the hearing, the circuit court entered an order on November 25, 2013, finding that midazolam hydrochloride is an FDA-approved drug routinely used as a pre-anesthetic sedative and as an anesthetic in minor surgical procedures. The circuit court concluded that the evidence was undisputed that the dosage called for in the revised lethal injection protocol, 500 milligrams, would induce not only

_____

10. Justice Canady dissented to the relinquishment, joined by Chief Justice Polston.

- 11 -

unconsciousness when properly administered, but would also result in respiratory arrest and ultimately death. The circuit court found that "a properly administered dosage of 500 milligrams would render a person insensate, and thus, not in any pain, during the period when the part of the brain that drives breathing stops working." The court further found that no evidence was presented that the movement of William Happ's head, noted by some observers during his October 2013 execution under the revised 2013 lethal injection protocol, demonstrated that he was experiencing any pain or suffering, and Muhammad's expert witness "acknowledged the movement during Happ's execution did not mean that he was actually harmed." Thus, the circuit court rejected the claim that use of midazolam hydrochloride as the first drug in the three-drug lethal injection protocol would result in a substantial risk of serious harm and accordingly held that the protocol was not unconstitutional.

Jurisdiction has returned to this Court and the parties have submitted supplemental briefs on this issue. We now consider all pending issues on appeal. We turn first to Muhammad's claim that use of midazolam hydrochloride as the first drug in Florida's 2013 three-drug lethal injection protocol violates the prohibition against cruel and unusual punishment in the United States Constitution or the Florida Constitution.[11]

---

11. See amend. VIII, U.S. Const.; article I, § 17, Fla. Const.

## ANALYSIS

## I. Constitutionality of Florida's Lethal Injection Procedures

Muhammad contends that prior to the evidentiary hearing on the issue of the safety and efficacy of midazolam hydrochloride, the circuit court erred in several respects in its evidentiary rulings. Muhammad contends that the hearing granted to him was not full and fair because most of his proposed witnesses were stricken, the subpoenas issued to two news reporters who observed the Happ execution in October 2013 were quashed, and he was denied a continuance to further prepare his expert witness, Dr. Mark Heath. However, we conclude that the circuit court did not abuse its discretion in any of these rulings.

### A. Ruling Quashing Journalists' Subpoenas and Excluding News Articles

The circuit court quashed subpoenas issued by Muhammad's counsel to Associated Press reporter Brendan Farrington and to Gainesville Sun newspaper reporter Morgan Watkins based on the qualified journalist's privilege set forth in section 90.5015, Florida Statutes (2013). The court also excluded evidence of news articles concerning information gathered by the two reporters while they were observing the October 2013 Happ execution, in which the revised protocol was followed for the first time. In the articles, the reporters noted that Happ blinked and moved his head several times in the minutes following introduction of midazolam hydrochloride.

The reporters filed motions to quash the subpoenas based on section 90.5015, which creates a qualified journalist's privilege against compelled testimony under certain circumstances. That section provides in pertinent part as follows:

> **90.5015. Journalist's privilege.—**
> (1) DEFINITIONS.—For purposes of this section, the term:
> (a) "Professional journalist" means a person regularly engaged in collecting, photographing, recording, writing, editing, reporting, or publishing news, for gain or livelihood, who obtained the information sought while working as a salaried employee of, or independent contractor for, a newspaper, news journal, news agency, press association, wire service, radio or television station, network, or news magazine. Book authors and others who are not professional journalists, as defined in this paragraph, are not included in the provisions of this section.
> (b) "News" means information of public concern relating to local, statewide, national, or worldwide issues or events.
> (2) PRIVILEGE.—A professional journalist has a qualified privilege not to be a witness concerning, and not to disclose the information, including the identity of any source, that the professional journalist has obtained while actively gathering news. This privilege applies only to information or eyewitness observations obtained within the normal scope of employment and does not apply to physical evidence, eyewitness observations, or visual or audio recording of crimes. A party seeking to overcome this privilege must make a clear and specific showing that:
> (a) The information is relevant and material to unresolved issues that have been raised in the proceeding for which the information is sought;
> (b) The information cannot be obtained from alternative sources; and
> (c) A compelling interest exists for requiring disclosure of the information.
> (3) DISCLOSURE.—A court shall order disclosure pursuant to subsection (2) only of that portion of the information for which the

showing under subsection (2) has been made and shall support such order with clear and specific findings made after a hearing.

(4) WAIVER.—A professional journalist does not waive the privilege by publishing or broadcasting information.

(5) CONSTRUCTION.—This section must not be construed to limit any privilege or right provided to a professional journalist under law.

§ 90.5015 (1)-(5), Fla. Stat. (2013) (emphasis added).

The reporter's qualified privilege applies to both confidential and non-confidential sources, see State v. Davis, 720 So. 2d 220, 222 (Fla. 1998), and in both criminal and civil cases, see Morris Communications Corp. v. Frangie, 720 So. 2d 230 (Fla. 1998). In order to overcome the privilege, the party must demonstrate that the journalist's information is relevant, that the information cannot be reasonably obtained from alternative sources, and that a compelling interest exists requiring disclosure. See § 90.5015(2)(a)-(c), Fla. Stat. (2013); McCarty v. Bankers Ins. Co., Inc., 195 F.R.D. 39, 47 (N.D. Fla. 1998). The requirement of a compelling interest has been characterized in different ways, but in 1958 the Second Circuit Court of Appeals described a compelling interest sufficient to satisfy the third prong of the test for overcoming the reporter's privilege as information that goes to the "heart of the plaintiff's claim." Garland v. Torre, 259 F.2d 545, 550 (2d Cir. 1958). The Eleventh Circuit described a "compelling interest" as one in which the information is "highly relevant, necessary to the proper presentation of the case, and unavailable from other

- 15 -

sources." U.S. v. Caporale, 806 F.2d 1487, 1504 (11th Cir. 1986) (citing Miller v. Transamerican Press, Inc., 621 F.2d 721, 726 (5th Cir. 1980) (finding a compelling interest where the only way that the claimant could prove his case was with the protected information)).

In this case, the circuit court found that Muhammad failed to satisfy the three-prong test for overcoming the qualified privilege. The court concluded that the information was not relevant to the narrow issue before the court, that Muhammad failed to exhaust other alternative sources who could provide the same information, and that he failed to demonstrate a compelling interest. Muhammad contends that the information was relevant to his claim that midazolam hydrochloride is not efficacious in anesthetizing the inmate, which is the issue for which the case was relinquished. He also contends that he could not reasonably obtain the information from other witnesses because their names were not released, and that he had a compelling interest in the information because of the constitutional nature of his claim.

We conclude that the circuit court did not abuse its discretion in quashing these two subpoenas based on the qualified privilege in section 90.5015. There were twenty-eight witnesses to the Happ execution. Muhammad failed to explain why he could not discover the identity of even one of those witnesses other than through public records requests that were denied him. Further, his own expert

- 16 -

witness read the news articles in question and was aware of the reports of Happ's movements after introduction of midazolam hydrochloride in the lethal injection procedure. Dr. Heath did not testify that the movement reported in the articles indicated Happ was conscious or that the midazolam hydrochloride did not work as anticipated. He testified instead that movement does not necessarily equate with consciousness. Further, Dr. Evans gave similar testimony. Thus, Muhammad failed to demonstrate a compelling interest in disclosure of the information gathered by the news reporters in the scope of their employment, and failed to demonstrate that the information, even if relevant to the efficacy of midazolam hydrochloride, could not have been obtained from alternate sources.

For similar reasons, the circuit court did not reversibly err in denying admission of the news articles themselves. The articles constituted hearsay. See Valle v. State, 70 So. 3d 530, 547 (Fla. 2011) (holding that the circuit court did not err in excluding as inadmissible hearsay the affidavits of two reporters, and newspaper articles written by them, detailing their accounts of an execution). Because Muhammad failed to overcome the qualified journalist's privilege under section 90.5015, and because the news articles were inadmissible hearsay, the circuit court did not abuse its discretion in quashing the subpoenas and in excluding the articles.

B.  Ruling Striking Witnesses and Denying a Continuance

Muhammad also contends that the circuit court abused its discretion in striking all of his witnesses except Dr. Heath.  Prior to the evidentiary hearing, the circuit court struck most of Muhammad's proposed witnesses, including DOC attorney David Arthmann; Secretary of DOC Michael Crews; DOC Deputy Communications Director Misty Cash; Florida State Prison Warden John Palmer; attorneys D. Todd Doss, Neal Dupree, Roseanne Eckert, Suzanne Keffer, Todd Sher; Executive Office of the Governor attorney Thomas Winokur; and execution team members and observers from the Happ execution on October 15, 2013, and the execution of Darius Kimbrough on November 12, 2013.

On November 19, 2013, the circuit court heard the State's motion to compel the names of proposed defense witnesses who would offer relevant testimony on the limited issue for which the case was relinquished.  Muhammad's counsel indicated that most of the witnesses had been listed in his postconviction motion, including Arthmann, Cash, and Crews, and that a few more would be added later that day in a revised list.  Because of the compressed time frame for holding the evidentiary hearing, the circuit court took up the State's objections to the testimony of these three witnesses and granted the motion to strike over Muhammad's objection that he was not prepared to state what relevant testimony they might offer.  The court allowed counsel to file written objections and a statement of the

relevance of their proposed testimony. In response, Muhammad filed a motion for rehearing and an objection that he was not required to set forth the relevance of a witness's testimony before calling the witness to testify. In that filing, Muhammad also explained that he sought to call Secretary Crews to testify about what matters DOC reviewed before issuing the revised protocol that included midazolam hydrochloride, and why he represented in a letter to the Governor that the drug will be safe and efficacious for use in lethal injection. Muhammad said he sought to call Misty Cash to testify about "research" that she referred to in her statement to the press on October 14, 2013, in explaining the revised lethal injection protocol and the DOC's opinion that midazolam hydrochloride would not present a substantial risk of serious harm. Muhammad said he sought to present Arthmann to testify about his knowledge of any DOC records that would discuss the research DOC undertook or relied on in revising its lethal injection protocol.

Muhammad filed his final witness list, which included the three DOC employees, five defense attorneys, a representative of the manufacturer of midazolam hydrochloride, two journalists, an attorney from the Executive Office of the Governor, as well as all execution team members, medical personnel, and FDLE employees who observed or participated in the Happ and Kimbrough executions.

In a hearing on November 20, 2013, the circuit court heard argument about whether a majority of the witnesses should be stricken. After hearing the argument concerning possible relevance of the witnesses' testimony, the circuit court granted the State's motion to strike all the witnesses except Dr. Heath, Juliana Reed or another representative of Hospira, which manufactures midazolam hydrochloride, and the two news reporters, Farrington and Watkins. The reporters' motions to quash their subpoenas based on journalist privilege were later granted and Muhammad was unable to secure the attendance of Reed, so Muhammad's only witness was Dr. Heath.

"It is well settled that '[t]he admissibility of evidence is within the sound discretion of the trial court, and the trial court's determination will not be disturbed on appellate review absent a clear abuse of that discretion.' " Rimmer v. State, 59 So. 3d 763, 774 (Fla. 2010) (quoting Brooks v. State, 918 So. 2d 181, 188 (Fla. 2005)). We conclude that the circuit court did not abuse its discretion in striking the witnesses. In our order in this case, we relinquished jurisdiction "for the narrow purpose of holding an evidentiary hearing solely on Muhammad's claim regarding the efficacy of midazolam hydrochloride as an anesthetic in the amounts prescribed by Florida's protocol." Just as in Valle, in which we relinquished for the same reason concerning a change in the first drug in the three-drug protocol, our concern is focused on evidence relating to whether the drug will sufficiently

render an inmate unconscious before the administration of the last two drugs. See Valle, 70 So. 3d at 547. In Valle, we affirmed the court's striking of a number of defense witnesses, including DOC employees, the Secretary of the DOC, and execution personnel, because their testimony was not relevant to the narrow issue on relinquishment. This same reason supports the circuit court's ruling in this case. We did not relinquish jurisdiction to determine why DOC chose midazolam hydrochloride as the first drug in the protocol, we relinquished to determine if the drug would be safe and efficacious if administered according to the protocols. Nor did we relinquish to hear what transpired in executions under prior protocols. Muhammad was given an opportunity to present his medical expert to testify concerning the safety and efficacy of midazolam hydrochloride and he did so. Dr. Heath was well aware of news reports and the testimony of FDLE Inspector Feltgen that in the Happ execution, movement was detected some minutes after the administration of the drug. Dr. Heath testified fully about the way in which the drug is used in normal surgical settings and opined that in the dosage required by the protocols, the drug would render the inmate unconscious in a matter of minutes and would ultimately lead to the inmate's death.

Muhammad also contends that he was not provided all the documents ordered to be produced by this Court in its relinquishment order. The order required the DOC to produce correspondence and documents it received from

Hospira concerning the drug's use in executions or otherwise, including those addressing any safety and efficacy issues. The DOC produced two letters from Hospira objecting to the use of the drug in executions and asking that any remaining drugs be returned. The DOC did not produce any drug package inserts or invoices for the purchase of the drug. We find that the DOC's interpretation of the phrase "documents and correspondence" not to include package inserts is a strained interpretation but any error is harmless.

Muhammad's own expert, Dr. Heath, was a direct resource for Muhammad concerning approved uses of the drug and any safety and efficacy warnings associated with it. Muhammad contends that the invoices that were not produced would be relevant in determining whether the drug had expired or was subject to recall. Again, Muhammad could ascertain through his own witness if midazolam hydrochloride had ever been recalled. And, even if the invoices could have indicated when the drug would expire, we find any error in failure to disclose the invoices to be harmless. The lethal injection protocol expressly requires that a designated execution team member will purchase the lethal chemicals to be used in the execution and will "ensure that the lethal chemicals have not reached or surpassed their expiration dates." In addition, the protocol calls for the FDLE monitor to confirm that all lethal chemicals "are correct and current." We will not presume that the DOC will violate its own protocol in regard to assuring that the

lethal drugs have not surpassed their expiration dates.  Thus, the failure of the DOC to produce the invoices did not deny Muhammad a full and fair hearing.

Muhammad also contends he was not given a full and fair hearing because his motion to continue the hearing to allow more time to consult with Dr. Heath and to prepare his testimony was denied.  We disagree.  The circuit court did not abuse its discretion in denying a continuance of the evidentiary hearing.  Muhammad had sufficient time to prepare the witness, who had been identified as Muhammad's expert witness as early as the filing of the postconviction motion in October 2013.  Nor did the fact that Dr. Heath was required to testify by telephone impair the fairness of the proceedings.  The State presented its own medical expert witness by telephone as well, and the record discloses no difficulty or complications caused by telephonic testimony of either witness.  For all these reasons, relief is denied on the claim that Muhammad was not provided a full and fair hearing.  The testimony given at the evidentiary hearing is discussed next.

C.  Evidentiary Hearing Testimony

At the evidentiary hearing held November 21-22, 2013, Muhammad presented the testimony of Dr. Heath, a board certified anesthesiologist at the New York Presbyterian Hospital at Columbia University.  In preparation for his testimony, he reviewed the revised DOC lethal injection protocol, correspondence from Hospira, news articles by reporters Farrington and Watkins, and the

testimony of FDLE Inspector Feltgen concerning his observations of the Happ execution.  Dr. Heath testified that midazolam hydrochloride is an FDA-approved drug in the class of drugs called "benzodiazepine."  He testified that it is used in the operating room as both a pre-anesthetic and an anesthetic to cause sedation and reduce anxiety, and "in very high doses will completely ablate consciousness."  In his practice, he uses the drug to make the patient less anxious.  A small amount is administered for this purpose, such as one milligram.  To produce a deeper level of anesthesia, Dr. Heath testified that he would give a dose of 10 or 15 milligrams, which "in [his] experience, will reliably produce a much deeper level of unconsciousness."

Dr. Heath testified that midazolam hydrochloride is generally slower to act than a barbiturate, but when successfully delivered to the brain will have full efficacy as an anesthetic.  As to the duration of unconsciousness, he explained that "[i]f you give any of these drugs in a very large dose, such as the doses that are used in lethal injections, then they will all last for a very long time.  They would last for many hours."  He opined that the dosage of midazolam hydrochloride called for in the protocol, 500 milligrams, is a much larger dose than that needed to produce unconsciousness and in that amount would, with certainty, produce death.  When asked about the significance of Happ's movement that was observed during his execution in October 2013, Dr. Heath agreed that movement is not the same as

- 24 -

consciousness and that an unconscious person may still move, although such an individual might in fact be conscious.

The State presented the testimony of Dr. Roswell Lee Evans, Jr., a pharmacist, professor of pharmacy, and Dean at Auburn University. He testified that midazolam hydrochloride is an FDA-approved drug used for induction of general anesthesia, with a dose of 35 to 40 milligrams for minor surgeries. Dr. Evans testified that midazolam hydrochloride is quickly absorbed into the bloodstream when introduced intravenously. If a person were given 250 milligrams, he or she would be rendered unconscious in no more than two minutes; and that the higher the dose, the longer the person will remain unconscious. He testified that the dosage called for in the lethal injection protocol, 500 milligrams given in two separate doses, would cause respiratory arrest and possibly cardiac arrest, and would render the person insensate or comatose. He also agreed that movement by a person who was given midazolam hydrochloride would not indicate consciousness, although he would be surprised if an individual moved more than five minutes or so after its administration; but he explained that reports of Happ's movement, if observed nine minutes after administration of the drug, could have been a response to depressed respiration.

Both Dr. Heath and Dr. Evans agreed that the consciousness check called for in the protocol is critically important. Dr. Evans noted that a consciousness check

using an eyelid tap, such as is done in Florida executions, is also used in surgical settings and is necessary to measure the depth of unconsciousness. Dr. Heath opined that because midazolam hydrochloride takes longer to effect unconsciousness, the Florida protocol should specify an extended period of time after administration before the consciousness check is performed.

The State also presented the testimony of FDLE Inspector Feltgen, who was an official monitor for the Happ execution. He testified that during the execution, he was located in the chemical room, standing next to the person who injected the drugs, and that he could observe the whole execution chamber through a two-way mirror. After the first syringe of midazolam hydrochloride was injected, Feltgen saw Happ breathe heavily four or five times, with his chest rising off of the table. This action may have gone on through the second syringe of midazolam hydrochloride. Feltgen observed the warden perform a consciousness check and saw no movement by Happ. Feltgen testified that Happ's execution looked very similar to the two other executions Feltgen had observed, except for Happ's heavy breathing at the beginning.

D. Order on Relinquishment Regarding Efficacy of Midazolam Hydrochloride

The circuit court ruled after the evidentiary hearing that, based on the testimony of both Dr. Heath and Dr. Evans, it has been established that midazolam hydrochloride is an FDA-approved drug routinely used as a pre-anesthetic and as

an anesthetic in minor surgical procedures.  The court found that the testimony also established that the dosage called for in Florida's three-drug lethal injection protocol, 500 milligrams, would induce not only unconsciousness, rendering the individual insensate and not in any pain, but when properly administered would ultimately cause death.  The circuit court further concluded that the evidence established that even if Happ moved after administration of midazolam hydrochloride during his execution in October 2013, such movement does not equate to pain.  We agree that these findings are supported by competent, substantial evidence.  Further, competent, substantial evidence established that Happ's movement, reported by several news reporters whose articles were reviewed by Dr. Heath prior to his testimony, does not necessarily equate with consciousness.

In denying Muhammad's claim that the use of midazolam hydrochloride as the first drug violates the Eighth Amendment's prohibition against cruel and unusual punishment, the circuit court held that Muhammad failed to present any credible evidence that, when administered in the amount called for in Florida's lethal injection protocol, the drug is "sure or very likely to cause serious illness and needless suffering" and give rise to "sufficiently imminent dangers" under the standard set forth in the plurality decision of the United States Supreme Court in Baze v. Rees, 553 U.S. 35, 50 (2008).  The Baze decision also pointed out that the

Constitution does not require the avoidance of all risk of pain in carrying out executions, id. at 47, only that it not present "the sort of 'objectively intolerable risk of harm' " that qualifies as cruel and unusual.  Id. at 50.

### E.  Application of the Law to the Facts

The Supreme Court's plurality decision in Baze held that the petitioners in that case "have not carried their burden of showing that the risk of pain from maladministration of a concededly humane lethal injection protocol" constitutes cruel and unusual punishment.  Id. at 41.  Muhammad makes a similar claim in this case that, if not properly administered and if the individual's level of consciousness is not properly determined, the use of midazolam hydrochloride will result in severe and needless suffering when the two subsequent drugs are administered. However, Dr. Heath agreed that the dosage of midazolam hydrochloride called for in the protocol, if properly administered together with adherence to the procedures for determining consciousness, will result in an individual who is deeply unconscious and who would feel no pain when the remaining drugs are administered.

We reject Muhammad's invitation to presume that the DOC will not act in accordance with its lethal injection procedures adopted by the DOC.[12]  The

_____

12.  We reject Muhammad's characterization of the testimony of FDLE agent Feltgen, which Muhammad contends shows that the paralytic drug was injected only thirty seconds after the first injection of midazolam hydrochloride in

sufficiency of those procedures, other than the recent substitution of the midazolam hydrochloride as the first drug, were previously approved by this Court after a comprehensive evidentiary hearing in Lightbourne v. McCollum, 969 So. 2d 326 (Fla. 2007). When we relinquished for an evidentiary hearing in Valle to examine the safety and efficacy of pentobarbital, which had been substituted as the first drug in the three-drug lethal injection protocol, we reiterated that the portion of Florida's lethal injection protocol ensuring that an inmate will be unconscious prior to administration of the second and third drugs has not been altered since the protocol was approved in Lightbourne. Valle, 70 So. 3d at 541 n.12. Under that protocol, "he will not be injected with the final two drugs, and the execution will be suspended until Valle is unconscious."[13] Id. In the instant case, as we said in Valle, the remainder of the protocol has not been revised. We presume that the DOC will follow its own procedures and Muhammad will not be injected with the final two drugs until he is unconscious.

the Happ execution, in violation of the protocol. A full reading of Feltgen's testimony, and his recounting of the steps that were followed in the Happ execution, demonstrate that the DOC followed its protocol in injecting two syringes of midazolam hydrochloride and a third syringe of saline, and that only after the consciousness check was performed and unconsciousness determined was Happ injected with vecuronium bromide.

13. For this same reason, we find no error in the circuit court's limitation on examination of witnesses on matters outside the narrow issue of the safety and efficacy of midazolam hydrochloride.

We acknowledge that, as we explained in Lightbourne, if the inmate is not fully unconscious when the second and third drugs, vecuronium bromide and potassium chloride, are administered, the inmate will suffer pain. See Lightbourne, 969 So. 2d at 351. However, we agree with the circuit court that Muhammad has not demonstrated that the conditions presenting this risk are "sure or very likely" to cause serious illness or needless suffering and give rise to "sufficiently imminent dangers" under the standard set forth in Baze. Thus, we reject his constitutional challenge to the use of midazolam hydrochloride in the lethal injection procedure. See also Valle, 70 So. 3d at 540-41 (rejecting challenge to newly-revised protocol substituting pentobarbital for the first drug in the three-drug protocol because Valle failed to show that the conditions presenting the risk must be sure or very likely to cause serious illness and needless suffering and give rise to sufficiently imminent dangers).

## F. Manufacturer's Letters

We also reject Muhammad's contention that the protocol is unconstitutional because the manufacturer, Hospira, wrote letters to the DOC expressing its disagreement with the use of midazolam hydrochloride in executions and demanding that any of the drug still in the DOC's possession be returned. As we held in Valle, a manufacturer's warning against the use of its drug in lethal injections does not establish a substantial risk of harm, 70 So. 3d at 542, and does

- 30 -

not render the use of the drug unconstitutional.  See also Powell v. Thomas, 784 F. Supp. 2d 1270, 1281 n.7 (M.D. Ala. 2011) (noting that manufacturer's opposition to drug's use in lethal injection is not relevant to the issues or the inmate's burden), aff'd, 641 F.3d 1255 (11th Cir.), cert. denied, Williams v. Thomas, 131 S. Ct. 2487 (2011).

## G.  One-Drug Protocol

Muhammad also contends that Florida should be required to convert its lethal injection protocol to a one-drug protocol because a number of other states have changed to a one-drug protocol, which does not involve a paralytic drug and does not involve potassium chloride.  Muhammad contends that because a one-drug protocol has been successfully used in other states, is available, and avoids the risks of pain presented by the second and third drugs, this change to a one-drug protocol is required, and that Florida's failure to use it constitutes cruel and unusual punishment in light of evolving standards of decency.  The State counters that Florida's current protocol does not violate the constitution simply because other states have altered their method of lethal injection.  We agree.

The plurality decision of the Supreme Court in Baze stated that "a condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative."  533 U.S. at 51.  The plurality decision in Baze also stated:

Permitting an Eighth Amendment violation to be established on such a showing would threaten to transform courts into boards of inquiry charged with determining "best practices" for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology. Such an approach finds no support in our cases, would embroil the courts in ongoing scientific controversies beyond their expertise, and would substantially intrude on the role of state legislatures in implementing their execution procedures—a role that by all accounts the States have fulfilled with an earnest desire to provide for a progressively more humane manner of death.

Id. Baze further cautioned that "the proffered alternative must effectively address 'a substantial risk of serious harm.' " Id. at 52. Thus, before it could be said that Florida must adopt a one-drug protocol, the current three-drug lethal injection protocol must be determined to present "a substantial risk of serious harm" under Baze. That has not been established in this case.

Substantially after the Baze decision in 2008, the Eleventh Circuit rejected a similar challenge in Pardo v. Palmer, 500 F. App'x 901, 904 (11th Cir. 2012), stating:

Pardo's allegedly distinguishable contention that "the one-drug protocol is now constitutionally required" is insufficient to differentiate this case from Ferguson. We likewise addressed Ferguson's "evolving standards of decency" claim—which Pardo reiterates here—and found it lacking: "[a]lthough the one-drug protocol is a feasible alternative that could be readily implemented, 'a condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative.' " See Ferguson, No. 12-15191, 2012 WL 4946112, at *3 (quoting Baze v. Rees, 553 U.S. 35, 51 (2008)). Even if nine of our sister states have adopted a one-drug protocol, it is not our role to transform ourselves into a "board[ ] of inquiry charged with determining the 'best practices' for executions." Baze, 553 U.S. at 51.

Pardo, 500 F. App'x at 904, cert. denied, 133 S. Ct. 815 (2012). Thus, Florida is not obligated to adopt an alternative method of execution without a determination that Florida's current three-drug protocol is unconstitutional.

Because we have concluded that Muhammad failed to establish that the current three-drug lethal injection protocol using midazolam hydrochloride as the first drug in the procedure presents a serious risk of needless suffering or sufficient imminent danger in violation of the Eighth Amendment's prohibition against cruel and unusual punishment, and because Muhammad has failed to establish that Florida must adopt a one-drug lethal injection protocol, we deny relief on this claim.

## II. Clemency Claims

Muhammad next contends that he was denied due process in his clemency proceedings. He alleges that in the fall of 2011, attorney Linda McDermott was appointed to represent him in clemency proceedings after being requested to act as Muhammad's clemency counsel at the request of the Florida Parole Commission, and that she undertook that representation. His postconviction motion alleged that in January 2012, the Florida Parole Commission filed a motion asking the circuit court to appoint new clemency counsel for Muhammad. He contended as he does here that the effort to remove McDermott as his clemency counsel "appeared to be a calculated effort on behalf of the Office of the Attorney General to interfere with

Muhammad's clemency proceeding," thus making the clemency proceeding a sham and violating his right to due process.[14] He also contended that while in prison, he had surgery that resulted in complications requiring follow-up treatment with a specialist, and that this situation raised "a looming question of DOC liability for the permanent damage done to his vocal cords." Muhammad was offered a September 2012 clemency interview and did not attend, based on his interpretation of his doctor's orders concerning the use of his voice. However, his counsel did submit additional clemency materials to the Office of Executive Clemency for consideration. By letter dated October 21, 2013, the Office of Executive Clemency notified Muhammad that clemency had been denied; and the death warrant in this case indicates that clemency was considered and rejected as not appropriate in this case. The circuit court summarily denied the claim based on this Court's precedent that the clemency process is solely the prerogative of the Governor.

We explained in Carroll v. State, 114 So. 3d 883 (Fla.), cert. denied, 133 S. Ct. 2762 (2013), as follows:

---

14. We note that valid statutory grounds existed upon which removal of McDermott as clemency counsel could have been sought. Chapter 940, Florida Statutes (2011), pertains to executive clemency. Section 27.711(11), Florida Statutes (2011), sets forth a prohibition for postconviction counsel appointed under chapter 27, such as McDermott, to represent defendants in chapter 940 proceedings and certain other proceedings—prohibitions that this Court has upheld. See, e.g., Darling v. State, 45 So. 3d 444, 455 (Fla. 2010) (upholding prohibitions in statute).

The clemency process in Florida derives solely from the Florida Constitution and we have recognized that the people of the State of Florida have vested "sole, unrestricted, unlimited discretion exclusively in the executive in exercising this act of grace." Sullivan v. Askew, 348 So. 2d 312, 315 (Fla. 1977).

. . . .

We have previously rejected similar challenges to the clemency process. In Pardo v. State, 108 So. 3d 558, 568 (Fla.), cert. denied, 133 S. Ct. 815 (2012), we rejected the clemency claim in large part because it is not this Court's prerogative to second-guess the executive branch on matters of clemency in capital cases. In Johnston, we rejected an identical clemency claim and stated:

> We also noted in Marek v. State, 14 So. 3d 985 (Fla. 2009), after Marek raised a second challenge to the clemency process, that "five justices of the United States Supreme Court concluded [in Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998)] that some minimal procedural due process requirements should apply to clemency . . . [b]ut none of the opinions in that case required any specific procedures or criteria to guide the executive's signing of warrants for death-sentenced inmates." Marek, 14 So. 3d at 998. We again conclude that no specific procedures are mandated in the clemency process and that Johnston has been provided with the clemency proceedings to which he is entitled.

Johnston, 27 So. 3d at 25-26 (emphasis added). See also Valle, 70 So. 3d at 551 (rejecting claim that clemency proceeding did not serve the "fail safe" purpose for which clemency is intended); Rutherford v. State, 940 So. 2d 1112, 1122-23 (Fla. 2006) (denying a clemency claim because the defendant had a hearing and because clemency is an executive function); Bundy v. State, 497 So. 2d 1209, 1211 (Fla. 1986) (stating that it is not this Court's "prerogative to second-guess the application of this exclusive executive function").

Id. at 888-89 (additional emphasis added).

Muhammad rejected the opportunity for a clemency interview in September 2012 based on what the record reflects to be his own misunderstanding of medical advice about the use of his voice. In signing the death warrant in this case, the Governor indicated that clemency has been considered and rejected. Clemency is solely the prerogative of the Governor. No specific procedures are required in clemency proceedings, and Muhammad's allegations do not support a claim that the circumstances surrounding his clemency denied him minimal procedural due process. Therefore, the circuit court did not err in summarily denying Muhammad's claim that the clemency proceedings in this case were flawed.

### III. The "Timely Justice Act of 2013"

In his postconviction motion, Muhammad challenged portions of the "Timely Justice Act of 2013" (the Act),[15] in which the Legislature amended a number of statutes relating to certain aspects of capital postconviction representation and the issuance of death warrants in capital cases. Muhammad challenges the constitutionality of amendments to section 922.052, Florida Statutes, that direct the Clerk of this Court to certify in writing to the Governor that a person sentenced to death has completed direct appeal and initial postconviction proceedings in state court and habeas corpus proceedings and appeal therefrom in federal court, or has allowed that time to expire. See § 922.052(2)(a)1. & (a)2.,

_____

15. Ch. 2013-216, Laws of Florida, effective July 1, 2013.

Fla. Stat. (2013). He also challenges as unconstitutional the amendments to section 922.052 directing the Governor to sign a death warrant within thirty days after receiving the certification from the Clerk of the Florida Supreme Court "if the executive clemency process has concluded, [and] directing the warden to execute the sentence within 180 days, at a time designated in the warrant." § 922.052(2)(b), Fla. Stat. (2013). The amendments further provide that if the Governor determines that the Clerk has not complied with subsection (2)(a), the Governor may sign a warrant of execution for any person "where the executive clemency process has concluded." § 922.052(2)(c), Fla. Stat. (2013). The remainder of section 922.052 remains unchanged. Muhammad contends that the amendments are unconstitutional encroachments on this Court's authority, on the rights of postconviction defendants, and on the sole authority of the Governor in matters of clemency and issuance of death warrants; thus, he contends, his death warrant cannot stand. The circuit court denied the claim and concluded the amendments were not unconstitutional.

We do not reach Muhammad's constitutional challenge to the amendments to section 922.052 pursuant to the Act. The Office of Executive Clemency initiated Muhammad's clemency proceeding in September 2012, long before passage of the Act, and that office accepted follow-up documents as to clemency for several months thereafter. It cannot be said that Muhammad's death warrant

would not have been signed but for the Act. Moreover, because it is not this Court's prerogative to inquire into the basis on which the Governor signed any individual death warrant, we cannot presume that signing Muhammad's death warrant was prompted by the Act or by the letter sent by the Supreme Court Clerk to the Governor, which contained a list of many names other than Muhammad's. For these reasons, we conclude that it is inappropriate and unnecessary for this Court, or the trial court, to reach the issue of the constitutionality of any portion of the Act in this successive postconviction proceeding or to strike the death warrant in this case based on Muhammad's claim. Because we do not reach the issue, our affirmance of the circuit court's denial of postconviction relief in this appeal is not a ruling on the merits concerning the constitutionality of any portion of the Act. We turn next to the public records claim that Muhammad raised in this proceeding.

### IV. Public Records

Muhammad contends that he was wrongfully denied access to public records under two different subsections of Florida Rule of Criminal Procedure 3.852 and under chapter 119, Florida Statutes. He contends that certain requested records were required to be produced under rule 3.852(h)(3), which allows a request within ten days after a death warrant is signed of records from those persons and agencies from whom records were previously requested. He also contends that additional records requested under 3.852(i), which allows requests from new agencies or

- 38 -

persons, should have been provided because they were necessary and relevant to both framing his postconviction claims and prosecuting his claims.

This Court has held that denial of public records requests are reviewed under the abuse of discretion standard. See Dennis v. State, 109 So. 3d 680, 698 (Fla. 2012); Diaz v. State, 945 So. 2d 1136, 1149 (Fla. 2006). "Discretion is abused only when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court." State v. Coney, 845 So. 2d 120, 137 (Fla. 2003) (quoting White v. State, 817 So. 2d 799, 806 (2002)). The Court has long acknowledged that the public records procedure under Florida Rule of Criminal Procedure 3.852 "is not intended to be a procedure authorizing a fishing expedition for records unrelated to a colorable claim for postconviction relief." Valle, 70 So. 3d at 549 (quoting Moore v. State, 820 So. 2d 199, 204 (Fla. 2002) (quoting Glock v. Moore, 776 So. 2d 243, 253 (Fla. 2001))).

Rule 3.852(h)(3) provides that within ten (10) days after the signing of a death warrant, a records request may be made to a person or agency from whom collateral counsel has previously requested records. The rule provides that upon such request, a person or agency shall copy, index, and deliver to the records repository "any public record" (A) that was not previously the subject of an objection; (B) that was received or produced since the previous request; or (C) that

was, for any reason, not produced previously.  See Fla. R. Crim. P. 3.852(h)(3)(A)-(C).  If none of the grounds are present for production, the rule requires that the person or agency shall file an affidavit stating that no other records exist and that all public records have been produced previously.  We have previously held that this discovery tool is not intended to authorize a "fishing expedition" unrelated to a colorable claim for postconviction relief.  See Sims v. State, 753 So. 2d 66, 70 (Fla. 2000).  We have noted that requests for records under rule 3.852(h)(3) may be denied as far exceeding the scope of subsection (h)(3) if they are overbroad, of questionable relevance, and unlikely to lead to discoverable evidence.  See Mills v. State, 786 So. 2d 547, 552 (Fla. 2001); see also Rutherford v. State, 926 So. 2d 1100, 1117 (Fla. 2006) (affirming denial of records under rule 3.852(h)(3) because no prior requests were made and because the records are not related to a colorable claim for postconviction relief).

Muhammad requested public records under rule 3.852(h)(3) from the DOC; Medical Examiner William Hamilton, M.D.; the FDLE; the State Attorney for the Eleventh Judicial Circuit (Miami); and the State Attorney for the Eighth Judicial Circuit (Bradford County).[16]  In each of these requests, Muhammad asked for "any

---

16. The representative for the offices of the State Attorneys from whom records were requested advised the court that they had no documents relevant to the request.  Records were also requested under rule 3.852(h)(3) from the Miami-Dade Police Department, but that office filed an affidavit stating that a records review had been undertaken and all records had been previously provided.

files, records, reports, letters, memoranda, notes, drafts and/or electronic mail in the possession or control of your agency pertaining to Mr. Muhammad that were received or produced by your agency since Mr. Muhammad's previous request; and/or any documents that were, for any reason, not produced previously." The circuit court denied Muhammad's motion to compel these entities to produce the requested records. We conclude that with one exception, the court did not abuse its discretion in denying the motion. The requests are overly broad and Muhammad did not clearly demonstrate how the records were relevant to a colorable claim. However, we conclude that the circuit court abused its discretion in denying Muhammad his own inmate and medical records. The record reflects that Muhammad's counsel had made previous requests for these records from the DOC, and in this proceeding he sought an update of his inmate and medical files. He also supported the request with the explanation that such records would be relevant to a potential, colorable claim concerning Muhammad's mental health.

Because Florida law provides that only after a death warrant is signed, an inmate may petition the Governor to determine if he or she is insane and therefore not competent to be executed, we find that Muhammad's inmate and medical records are relevant to such a potential claim and should have been produced.[17]

_____

17. See § 922.07, Fla. Stat. (2013); Fla. R. Crim. P. 3.811 and 3.812. "In order for insanity to bar execution, the defendant must lack the capacity to understand the nature of the death penalty and why it was imposed." Ferguson v.

Accordingly, we direct the DOC to immediately provide Muhammad's counsel with those portions of his inmate and medical files that have been received or produced since Muhammad's previous requests, or for whatever reason were not previously produced.

Muhammad also sought records under Florida Rule of Criminal Procedure 3.852(i), which allows a capital defendant to request additional public records, that are not required to be from agencies or persons from whom records were previously requested. Under subdivision (i), the defendant must demonstrate: (A) that counsel has made a timely and diligent search of the repository; (B) counsel's affidavit identifies with specificity those additional public records that are not at the repository; (C) that the additional public records are either relevant to the subject matter of the proceeding under rule 3.851 or appear reasonably calculated to lead to discovery of admissible evidence; and (D) the additional records request is not overly broad or unduly burdensome. We have held that "a defendant must show how the requested records relate to a colorable claim for postconviction relief and good cause as to why the public records request was not made until after the death warrant was signed." Mann v. State, 112 So. 3d 1158, 1163 (Fla. 2013).

---

State, 112 So. 3d 1154, 1156 (Fla.) (quoting Johnston v. State, 27 So. 3d at 26 n.8, cert. denied, 133 S. Ct. 498 (2012)).

Under subsection (i) of rule 3.852, Muhammad sought additional records from the DOC;[18] the FDLE; William Hamilton, M.D., medical examiner;[19] Office of Attorney General Pamela Bondi; the Office of the Governor; and the Office of

---

18. From the DOC and the FDLE, Muhammad sought voluminous records which he alleged were relevant to his claim challenging the revised method of lethal injection and to the process by which the September 9, 2013, revised lethal injection protocol was promulgated, including, but not limited to, the new lethal injection procedures, literature and research reviewed, communication with the Office of the Attorney General, Governor, any outside experts, other states, and the federal government; records relating to training exercises, including logs, checklists, and sign-in sheets from January 1, 2010, to the present; records relating to any correspondence with any Florida agency from January 1, 2010, to the present relating to the acquisition of pentobarbital, vecuronium bromide, potassium chloride, and midazolam hydrochloride; records relating to communication with any other department of corrections in any other state regarding lethal injection protocols from January 1, 2010, to the present; records regarding the purchase, storage, maintenance, use, distribution, and disposal of pentobarbital and/or midazolam hydrochloride that show compliance with the Federal Controlled Substance Act and Florida Statutes, chapters 828, 893, and 464; records showing the manufacturer and distributor of lethal injection drugs including package inserts, instructions, date of manufacture, shelf life of midazolam hydrochloride, pentobarbital, vecuronium bromide, and potassium chloride currently possessed by the DOC; records of executions by lethal injection of Schwab, Henyard, Tompkins, Marek, Grossman, Valle, Chandler, Waterhouse, D. Gore, Pardo, Mann, Carroll, Van Poyck, M. Gore, and Happ; and records indicating personnel changes or formal or informal changes to the unwritten procedures or customary practices testified to by DOC personnel in the litigation in Lightbourne in 2007.

19. From William Hamilton, M.D., medical examiner, Muhammad requested additional records under 3.852(i) including but not limited to post-execution photographs and examinations performed on executed inmate Happ, autopsy narrative reports, notes, diagrams, photos, and toxicology studies.

Executive Clemency, Florida Parole Commission.[20] The circuit court denied all of

Muhammad's records requests under rule 3.852(i). We conclude that the denial of

these records was not an abuse of discretion.

The DOC contended that the records request they received from Muhammad

was overbroad and burdensome, and did not appear to relate to, and would not lead

to, a colorable claim. The State also contended that information concerning the

source of the drugs has been held not to present a cognizable lethal injection claim.

See Pardo v. State, 108 So. 3d 558, 565-66 (Fla.), cert. denied, 133 S. Ct. 815

(2012); Valle, 70 So. 3d at 549. We agree that the voluminous request was

overbroad and burdensome, and the possible relevance to a colorable claim was not

established. Further, requests related to actions of lethal injection personnel in past

executions do not relate to a colorable claim concerning future executions because

there is a presumption that members of the executive branch will perform their

duties properly. See Valle, 70 So. 3d at 549. Moreover, as to the request for

_____

20. Muhammad requested additional records relating to clemency materials
in his own case which were in the Attorney General's custody or possession since
January 1, 2010, including correspondence, e-mails, reports, summaries,
newspaper articles, transcripts of hearings, research, notes or any other document,
photograph, or recording that was received or sent from any representative of the
Office of the Attorney General relating to clemency for Muhammad. Muhammad
requested the same additional records from the Office of the Governor under rule
3.852(i). And, the same additional records were requested from the Office of
Executive Clemency, Florida Parole Commission.

records of all the executions since that of inmate Schwab, no error has been shown. We held in Valle that the circuit court did not err in denying records of the DOC's executions of the last five inmates. Id. For all these reasons, the circuit court did not abuse its discretion in denying the voluminous public records request to the DOC.

Muhammad requested a long list of additional records from the FDLE under 3.852(i) similar to his request to the DOC. The circuit court ruled that the records request to FDLE was overbroad and burdensome, and generally as to all records requested pertaining to lethal injection, that the requested records would not lead to a colorable claim. For the same reasons set forth above concerning records requested from the DOC under rule 3.852(i), we find no abuse of discretion.

The lower court denied the records request to the medical examiner and concluded that the autopsy records sought from Dr. Hamilton were not related to a colorable claim that use of midazolam hydrochloride rendered the lethal injection protocol unconstitutional. Muhammad has not explained how autopsy photographs and reports concerning Happ could disclose at what point Happ was rendered unconscious or whether he experienced pain by virtue of the alleged inefficacy of midazolam hydrochloride. Denial of these records was not error.

The circuit court also denied disclosure of all the clemency-related records requested by Muhammad on the grounds that the requests were overbroad and not

related to a colorable claim.  We conclude that denial of access, or failure to

compel access, to the clemency records was not an abuse of discretion.  First,

clemency files and records are not subject to chapter 119 disclosure and are exempt

from production in a records request filed in a postconviction proceeding.  See

King v. State, 840 So. 2d 1047, 1050 (Fla. 2003); Roberts v. Butterworth, 668 So.

2d 580, 582 (Fla. 1996).  In addition, the records would not relate to a colorable

claim because we have held many times that claims challenging clemency

proceedings are meritless.  "The clemency process in Florida derives solely from

the Florida Constitution and we have recognized that the people of the State of

Florida have vested 'sole, unrestricted, unlimited discretion exclusively in the

executive in exercising this act of grace.' "  Sullivan, 348 So. 2d at 315; see also

Carroll, 114 So. 3d at 888-89 (holding clemency claim without merit because the

Court will not second-guess the executive on matters of clemency); Pardo, 108 So.

3d at 568 (rejecting clemency claim in large part because it is not this Court's

prerogative to second-guess the executive branch on matters of clemency in capital

cases).  Thus, because the clemency files are confidential and the claim

challenging the clemency process is without merit, the denial of records from the

Office of the Governor, the Office of the Attorney General, and the Parole

Commission was not an abuse of discretion.

## V. Discovery Motions

Muhammad contends that the circuit court erred in denying his discovery motions relating to his claim that the revised lethal injection protocol presents a risk of serious harm. The motions also sought an order requiring the DOC to identify all members of the execution team when Happ was executed; that the DOC identify all persons with any responsibility in drafting the revised lethal injection protocol issued September 9, 2013; to allow a deposition of medical examiner William Hamilton, M.D.; to identify the manufacturer of midazolam hydrochloride, vecuronium bromide, and potassium chloride used in Florida lethal injections, and the lot numbers and expiration dates of these drugs that are available for use in lethal injection.

Muhammad requested discovery concerning Happ's and Kimbrough's executions. Muhammad sought access to the November 12, 2013, execution and autopsy of Darius Kimbrough by motion in which he requested an order allowing him to send a photographer to videotape the execution, to send a witness to view the execution, to allow a qualified expert to have access to Kimbrough during the execution to monitor his physiological responses throughout the execution, and to permit an expert to have access to Kimbrough's body after the execution to perform a complete autopsy or, in the alternative, an order allowing a person to attend and photograph the autopsy of Kimbrough. The circuit court denied the

discovery request without explanation on November 4, 2013, after hearing argument at the October 31, 2013, case management conference. The circuit court did not abuse its discretion in denying these discovery requests.

As to the availability and scope of discovery in postconviction proceedings, this Court explained in Rodriguez v. State, 919 So. 2d 1252 (Fla. 2005):

> In State v. Lewis, 656 So. 2d 1248, 1249 (Fla. 1994), this Court held that it is within the trial judge's inherent authority to allow limited prehearing discovery during postconviction proceedings. We set forth the following parameters for such discovery: the motion seeking discovery must set forth good reason; the court may grant limited discovery into matters which are relevant and material; the court may set limits on the sources and scope of such discovery; and on review of orders limiting or denying discovery, the moving party has the burden of showing an abuse of discretion. Id. at 1250 (quoting Davis v. State, 624 So. 2d 282 (Fla. 3d DCA 1993), and adopting procedures established therein). In deciding whether to allow this limited form of discovery, the trial judge must consider "the issues presented, the elapsed time between the conviction and the postconviction hearing, any burdens placed on the opposing party and witnesses, alternative means of securing the evidence, and any other relevant facts." Id. Our opinion did not expand the discovery procedures established in Florida Rule of Criminal Procedure 3.220, which governs discovery, nor was the opinion to be interpreted as automatically allowing discovery in postconviction proceedings. We further cautioned that a trial judge's inherent authority to permit postconviction discovery "should be used only upon a showing of good cause." Id.

Id. at 1279. Thus, when discovery is allowed, it is limited discovery which is relevant and for which the movant demonstrates good cause.

As to the request that Muhammad be allowed to send persons to witness and photograph the Kimbrough execution, the circuit court did not abuse its discretion

- 48 -

in denying that request. As the State points out, the execution chamber is small and any additional personnel could interfere with the orderly and proper administration of the lethal injection. Moreover, Florida law sets forth who may be allowed to view an execution. Section 922.11(2), Florida Statutes (2013), provides that twelve citizens selected by the warden may view the execution, along with counsel for the inmate, and ministers requested by the inmate. News media may be present under rules approved by the Secretary of the DOC, and "[a]ll other persons, except prison officers and correctional officers, shall be excluded during the execution." Thus, denial was not an abuse of discretion.

It was also within the court's sound discretion to deny Muhammad the right to have his own expert autopsy Kimbrough and to deny videotaping of the Kimbrough autopsy as well. Section 922.11(3), Florida Statutes (2013), provides that the body of an executed person shall be delivered to the medical examiner for an autopsy. Muhammad did not demonstrate good cause for the right to perform a substitute or a second autopsy on Kimbrough. In addition, having additional persons in the room videotaping could interfere with the orderly administration of the autopsy.

As to denial of Muhammad's discovery request for an order identifying and allowing depositions of all members of the execution team and any other persons present when Happ was executed, the court did not abuse its discretion. First, this

request was overbroad, and Muhammad did not demonstrate how knowing the identities of these persons, or even being able to call them as witnesses, would be necessary and relevant to a colorable lethal injection claim concerning the safety and efficacy of midazolam hydrochloride.  Second, section 945.10 (g), Florida Statutes (2013), makes the identity of the executioner and any persons preparing, dispensing, or administering lethal injection confidential.  The provisions of section 945.10 which protect the confidentiality of the identity of members of the execution team have been upheld as constitutional and the Court has subsequently declined to recede from that ruling.  See Henyard v. State, 992 So. 2d 120, 130 (Fla. 2008) (citing Bryan v. State, 753 So. 2d 1244, 1250 (Fla. 2000)).  Muhammad has not demonstrated good cause for this veil of confidentiality to be lifted, nor has he demonstrated that relevant information could be obtained from any other persons involved in the process who are not covered by statutory confidentiality. Under the limited rights to discovery outlined in Lewis and Rodriguez above, and in light of the legislatively accorded confidentiality rights of members of the execution team, Muhammad's fishing expedition for information from the execution team and any other persons present was properly denied.

Muhammad also contends that the circuit court abused its discretion in denying discovery of persons with any responsibility in drafting the revised lethal injection protocol issued September 9, 2013.  The record is clear that Muhammad

had a copy of the September 9, 2013, revised lethal injection procedures. Based on comparison of the current revised protocol with the protocol immediately preceding it, Muhammad is able to determine the revisions made in the protocol. The proper issues before the lower court did not include the reasons why the DOC chose midazolam hydrochloride as the new first drug in the protocol—the proper issue was the safety and efficacy of the drug as an anesthetic. Discovery sought from persons with responsibility in drafting the revised lethal injection protocol was not relevant to the claims before the court. The circuit court did not abuse its discretion in the denying this discovery request.

Muhammad was also denied the right to depose William Hamilton, M.D., chief medical examiner for the Eighth District. In his brief, Muhammad simply argues this deposition, along with all the other information sought in his discovery request, was proper because he had pending a lethal injection claim. This unspecific justification does not meet the requirements of Lewis to support a circuit court's limited ability to order discovery in postconviction proceedings. No error has been shown in denial of this deposition.

Finally, Muhammad contends the circuit court abused its discretion in refusing to order the DOC to disclose the manufacturers of the lethal injection drugs used in Florida executions, together with the lot numbers and expiration dates. No abuse of discretion has been shown. We have held that the source of the

drugs used in lethal injection is of questionable relevance to a colorable Eighth Amendment claim. See Valle, 70 So. 3d at 549. The same principle would apply to the drugs' lot numbers and expiration dates. Moreover, this Court will presume that the DOC will act in accordance with its protocol and carry out its duties properly. See, e.g., id. This same presumption would extend to presume that the DOC will obtain viable versions of the drugs it intends to use and confirm before use that the drugs are still viable, as the protocol requires. Muhammad has failed to demonstrate any necessity and relevance sufficient to require the circuit court, in its ability to order limited discovery in postconviction proceedings, to allow discovery of this information.

For the foregoing reasons, Muhammad has failed to demonstrate abuse of discretion in denial of his discovery requests or in denial of any of his public records requests, other than for his own inmate and medical records from the DOC, which we have ordered to be immediately produced.

## VI.  Length of Time on Death Row

Muhammad next contends that adding execution to the lengthy period of time he has served on death row constitutes cruel and unusual punishment and violates the binding norms of international law. He has been on death row for over three decades for this particular murder. We have repeatedly rejected this same claim. This Court has recognized that "[n]o federal or state court has accepted the

argument that a prolonged stay on death row constitutes cruel and unusual punishment, especially where both parties bear responsibility for the long delay." Pardo, 108 So. 3d at 569 (quoting Valle, 70 So. 3d at 552 (quoting Tompkins, 994 So. 2d at 1085)). The claim that execution after a lengthy time on death row violates binding norms of international law has also been repeatedly rejected. See, e.g., Carroll, 114 So. 3d at 889 ("[T]his Court has repeatedly rejected similar claims that imposition of the death sentence after an extended period of time on death row constitutes cruel and unusual punishment or that it violates binding norms of international law."); Gore v. State, 91 So. 3d 769, 780 (Fla.) (rejecting claim that adding execution to the twenty-three years Gore spent on death row constitutes cruel and unusual punishment and violates "binding norms of international law."), cert. denied, 132 S. Ct. 1904 (2012).

Muhammad attempts to distinguish his circumstances from the normal case where an inmate is kept for a lengthy period of time on death row. However, the fact that he was placed in special solitary confinement after murdering a correctional officer while on death row does not provide a sufficient distinguishing basis for this Court to depart from its established precedent on this issue. Relief was properly denied on this claim.

## VII. Whether Mental Illness Should Bar Execution

In his last issue on appeal, Muhammad contends that his mental illness places him within the class of persons, similar to those under the age of eighteen at the time of the crime and those with mental retardation, who are categorically excluded from being eligible for the death penalty.[21]  His argument is based on the principles set forth in Roper v. Simmons, 543 U.S. 551, 578-79 (2005), which held that the death penalty is unconstitutional for defendants who were under the age of eighteen at the time of the crime, and Atkins v. Virginia, 536 U.S. 304, 321 (2002), which held that the death penalty is unconstitutional for mentally retarded defendants.  He contends that the principles set forth in these cases should be extended to the class of persons such as Muhammad who suffer from mental illness, on the ground that such persons are less morally culpable and, that under the "evolving standards of decency that mark the progress of a maturing society," Trop v. Dulles, 356 U.S. 86, 101 (1958), their mental illness should bar execution.

This Court has rejected similar claims on the merits in the past.  See, e.g., Carroll, 114 So. 3d at 886-87 (holding that similar claims that mental illness bars the death penalty have been rejected on the merits); Simmons v. State, 105 So. 3d 475, 511 (Fla. 2012) (holding claim that persons with mental illness must be

---

21.  It has been reported that Muhammad suffered from schizophrenia and paranoia.

treated similarly to those with mental retardation due to reduced culpability to be without merit); <u>Barwick v. State</u>, 88 So. 3d 85, 106 (Fla. 2011) (noting that "the Court has expressly rejected the argument that <u>Roper</u> extends beyond the Supreme Court's pronouncement that the execution of an individual who was younger than eighteen at the time of the murder violates the eighth amendment"); <u>Johnston</u>, 27 So. 3d at 26 (finding no merit in the claim that mentally ill persons are similar to and should be treated the same as juvenile murderers who are exempt from execution); <u>Lawrence v. State</u>, 969 So. 2d 294, 300 n.9 (Fla. 2007) (rejecting assertion that the Equal Protection Clause requires extension of <u>Atkins</u> to the mentally ill due to their reduced culpability).  For these reasons, summary denial of relief on this claim was proper.

## CONCLUSION

Based on the foregoing, we affirm the order of the circuit court denying Muhammad's successive postconviction claims,[22] but we reverse the order of the circuit court denying Muhammad disclosure of his own inmate and medical records.  Therefore, the Florida Department of Corrections is hereby ordered to immediately provide Muhammad's counsel with copies of Muhammad's inmate

22.  As noted earlier, the constitutionality of the amendments to section 922.052, Florida Statutes (2013), is not determined in this proceeding and our affirmance of the circuit court's denial of postconviction relief is not a ruling on the merits concerning the constitutionality of any portion of the "Timely Justice Act of 2013."

- 55 -

and medical records that have been compiled since that agency previously provided records to Muhammad. No rehearing will be entertained by this Court and the mandate shall issue immediately. We hereby lift the temporary stay imposed by this Court on November 18, 2013.

It is so ordered.

PARIENTE, QUINCE, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs in result.
CANADY, J., concurs in part and dissents in part with an opinion in which POLSTON, C.J., concurs.

CANADY, J., concurring in part and dissenting in part.

I would affirm the circuit court's order in its entirety. I therefore dissent from the majority's reversal on the claim regarding Muhammad's inmate and medical records. With respect to that claim, I would conclude that the records are not relevant to any colorable claim cognizable in this proceeding.

I concur in the lifting of the temporary stay.

POLSTON, C.J., concurs.

An Appeal from the Circuit Court in and for Bradford County,
	Phyllis M. Rosier - Case No. 80-341-CFA

Linda McDermott and Martin J. McClain of McClain & McDermott, P. A., Estero, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, and Sandra S. Jaggard, Assistant Attorney General, Miami, Florida,

for Appellee

Gregg D. Thomas and Rachel E. Fugate of Thomas & LoCicero PL, Tampa, Florida,

for Media Appellees, Brendan Farrington of the Associated Press and Morgan Watkins of The Gainesville Sun