# Supreme Court of Florida

_____

No. SC14-167
_____

**PAUL AUGUSTUS HOWELL,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[February 20, 2014]

PER CURIAM.

Paul Augustus Howell is a prisoner under sentence of death for whom a death warrant has been signed and execution set for February 26, 2014. Howell was convicted of first-degree murder and sentenced to death when the bomb he constructed, for the specific purpose of killing a witness, instead detonated and killed a Florida Highway Patrol Trooper. Howell v. State, 707 So. 2d 674, 683 (Fla. 1998) (affirming Howell's convictions and death sentence on direct appeal).

Howell now appeals the denial of his amended third successive motion for postconviction relief, filed pursuant to Florida Rule of Criminal Procedure 3.851, in which he challenges the Florida lethal injection protocol as applied to him.

Specifically, Howell raises the following seven claims on appeal to this Court: (1) when the State changes to a new and untested method of execution, the State should be required to present some evidence to demonstrate that the new method does not violate the Eighth Amendment; (2) the inclusion of midazolam hydrochloride (midazolam) as the first drug in the 2013 lethal injection protocol violates the Eighth Amendment; (3) the use of a three-drug protocol, instead of a one-drug protocol, violates the Eighth Amendment; (4) forced administration of vecuronium bromide, the second drug in the protocol, violates the Eighth and Fourteenth Amendments; (5) the constant change in Florida's lethal injection protocol violates the Eighth Amendment; (6) the postconviction court erred in denying Howell's motions for postconviction discovery; and (7) the postconviction court erred by denying Howell's request to strike the testimony of State witness Dr. Mark Dershwitz.

For the reasons set forth below, and after a careful review of the record, the briefs, and the claims raised, we affirm the postconviction court's denial of relief.

## FACTS AND PROCEDURAL HISTORY

The Governor previously signed a death warrant for Howell, and his execution was set for a year ago on February 26, 2013. Howell v. State, 109 So. 3d 763, 765 (Fla. 2013). The complete facts and procedural history of Howell's case are set forth in this Court's opinion from the 2013 death warrant

litigation, in which this Court denied relief on all of the claims raised in Howell's amended successive motion for postconviction relief and denied Howell's motion for a stay of execution. Id.

Subsequent to our opinion, the Eleventh Circuit Court of Appeals issued a stay of Howell's execution to address whether the failure of one of Howell's attorneys to file a timely federal habeas corpus petition required relief from the judgment that dismissed the untimely petition. Howell v. Sec'y, Dep't of Corr., 730 F.3d 1257, 1260 (11th Cir. 2013), pet. for cert. filed, ___ U.S.L.W. ___ (Jan. 29, 2014) (No. 13-8530). After holding that Howell was not entitled to have his federal habeas proceeding reinstated under the rationale of Holland v. Florida, 560 U.S. 631 (2010), the Eleventh Circuit lifted the stay of execution, and Howell's execution date was reset for February 26, 2014. Howell filed a petition for writ of certiorari with the United States Supreme Court, seeking review of the Eleventh Circuit's decision, and that petition is still pending. The claims before the Court in this case do not relate to Howell's federal litigation, but concern only challenges to the current lethal injection protocol that Howell filed in a successive motion for postconviction relief in state circuit court.

Specifically, Howell's amended third successive postconviction motion raised four lethal injection claims to the court below: (1) the inclusion of midazolam as the first drug in the 2013 protocol violates the Eighth Amendment's

prohibition on cruel and unusual punishment; (2) the forced administration of vecuronium bromide as the second drug in the protocol violates Howell's Eighth and Fourteenth Amendment rights; (3) Florida's constant change in the lethal injection protocol amounts to human experimentation in violation of the Eighth Amendment; and (4) the use of a three-drug protocol rather than a one-drug protocol violates Howell's Eighth Amendment rights. In addition to these claims, Howell filed numerous public records requests. The postconviction court summarily denied relief, concluding that an evidentiary hearing was not necessary because Howell's claims had either been previously rejected by this Court or were speculative in nature.[1] However, because Howell raised factual as-applied

---

1. The postconviction court summarily denied relief as to all of the claims raised, holding: (1) Howell's challenge to midazolam was already rejected by this Court in Muhammad v. State, 38 Fla. L. Weekly S919, 2013 WL 6869010 (Fla. Dec. 19, 2013), cert. denied, 134 S. Ct. 894 (2014); (2) Howell's Fourteenth Amendment challenge to vecuronium bromide was procedurally barred since it was not raised in Howell's prior lethal injection challenge and it failed on the merits because the United States Supreme Court rejected a similar claim in Baze v. Rees, 553 U.S. 35 (2008), in the Eighth Amendment context; (3) the frequency of changing the lethal injection protocol does not violate the Eighth Amendment and does not amount to human experimentation; and (4) arguing for a one-drug protocol instead of a three-drug protocol is insufficient to establish a constitutional violation. In addition, the postconviction court noted that, with respect to Howell's challenge to the procedures of the Florida Department of Corrections (DOC) in adopting a new protocol, DOC does not need to provide Howell with notice and an opportunity to be heard before it changes the lethal injection protocol. Finally, the postconviction court denied Howell's requests for DOC to provide him additional lethal injection protocol material beyond that already provided, stating that DOC's failure to provide documents beyond what the postconviction court approved does

challenges and relied on new evidence not yet considered by this Court, which raised a concern that Howell could regain consciousness during the administration of the second and third drugs in the protocol and thus be subjected to extreme pain, this Court relinquished jurisdiction for an evidentiary hearing as to the claim pertaining to the use of midazolam as the first drug in the protocol. Howell v. State, No. SC14-167, Order at 2 (Fla. Sup. Ct. Order entered Feb. 6, 2014).

Following the evidentiary hearing, at which both Howell and the State presented expert witness testimony concerning the current lethal injection protocol, the postconviction court denied relief. For the reasons that follow, we affirm the denial of relief as to Howell's claim regarding the use of midazolam and also affirm the postconviction court's denial of the remaining claims, holding that each of these claims is without merit.

## ANALYSIS

On appeal to this Court, Howell raises the following claims: (1) when the State changes to a new and untested method of execution, the State should be required to present some evidence to demonstrate that the new method does not violate the Eighth Amendment; (2) the inclusion of midazolam in the 2013 protocol violates the Eighth Amendment; (3) the use of a three-drug protocol,

not violate Howell's constitutional rights because Howell's records requests were overbroad, burdensome, and not relevant to a colorable claim.

instead of a one-drug protocol, violates the Eighth Amendment; (4) forced administration of vecuronium bromide violates the Eighth and Fourteenth Amendments; (5) the constant change in Florida's lethal injection protocol violates the Eighth Amendment; (6) the postconviction court erred in denying Howell's motions for postconviction discovery; and (7) the postconviction court erred by denying Howell's request to strike the testimony of State witness Dr. Mark Dershwitz.

In reviewing these claims, we first summarily deny three of the claims raised based either on the reasoning provided in the postconviction court's order or based on our clearly established precedent. Specifically, we reject Howell's claim concerning the adoption of a one-drug protocol, as opposed to the current three-drug protocol, for the same reasons we rejected this claim in Muhammad v. State, 38 Fla. L. Weekly S919, 2013 WL 6869010, at *11-12 (Fla. Dec. 19, 2013), cert. denied, 134 S. Ct. 894 (2014). We also summarily reject the claim that an Eighth Amendment violation can be established based solely on the fact that Florida's lethal injection protocol has been changed three times in three years. In fact, Howell does not even allege how this claim fits within the framework set forth by the United States Supreme Court in Baze v. Rees, 553 U.S. 35 (2008), for establishing an Eighth Amendment violation. Finally, we reject Howell's claim that the postconviction court erred in denying Howell's motions for postconviction

discovery, concluding that the postconviction court did not abuse its discretion when denying the requests. We also reject Howell's related constitutional challenges to Florida Rule of Criminal Procedure 3.852. See Wyatt v. State, 71 So. 3d 86, 110-11 (Fla. 2011).

We now proceed to address the remaining claims. Our analysis begins with a review of the proper standard that applies to Howell's allegation that Florida's current lethal injection protocol violates the Eighth Amendment.

**Proper Standard**

In the first remaining claim that we address, Howell contends that this Court should not rely on the United States Supreme Court's plurality decision in Baze, 553 U.S. 35, as setting forth the standard for establishing an Eighth Amendment violation because Baze addressed different policy concerns from the situation currently presented. According to Howell, when the State switches to a different drug not previously used in a lethal injection protocol, this Court should reduce the burden that an inmate must demonstrate in order to prevail on an Eighth Amendment claim and instead impose an initial burden on the State to establish that it has not violated the Eighth Amendment.

Before turning to the merits of this claim, we first review our precedent on the matter. As this Court has repeatedly recognized, article I, section 17, of the Florida Constitution requires this Court to evaluate "whether lethal injection is

unconstitutional 'in conformity with decisions of the United States Supreme Court.' " <u>Pardo v. State</u>, 108 So. 3d 558, 562 (Fla.) (quoting art. I, § 17, Fla. Const.), <u>cert. denied</u>, 133 S. Ct. 815 (2012). In <u>Sims v. State</u>, 754 So. 2d 657 (Fla. 2000), prior to any directly applicable precedent from the United States Supreme Court as to the standard for an Eighth Amendment claim based on a challenge to a state's lethal injection protocol, this Court for the first time addressed the use of lethal injection as the method of execution in Florida. The Court held that the defendant had failed to show that his challenge to lethal injection would violate the Eighth Amendment when his claims were relying on pure speculation. <u>Id.</u> at 668.

After complications subsequently occurred during the administration of the lethal injection chemicals at the execution of inmate Angel Diaz in 2006, this Court addressed the use of lethal injection in this state in <u>Lightbourne v. McCollum</u>, 969 So. 2d 326, 353 (Fla. 2007), where we affirmed the postconviction court's denial of relief and upheld the then-existing lethal injection protocol against numerous challenges litigated after a comprehensive evidentiary hearing. As we acknowledged, our role in addressing such a challenge is to determine "whether the method of execution through lethal injection, as currently implemented in Florida, is unconstitutional because it constitutes cruel and unusual punishment." <u>Id.</u> at 334. Importantly, we stressed that our "role is not to micromanage the executive branch in fulfilling its own duties relating to executions." <u>Id.</u> at 351.

Following our decision in Lightbourne, the United States Supreme Court issued its decision in Baze, 553 U.S. 35, in which the Court provided the requirements that a defendant must satisfy in order to succeed on an Eighth Amendment challenge to a state's lethal injection protocol. As this Court has previously explained, "[a]lthough subjecting one to a risk of future harm can qualify as cruel and unusual punishment, the Supreme Court in Baze explained that to prevail on such a claim, condemned inmates must demonstrate that 'the conditions presenting the risk must be sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers.' " Pardo, 108 So. 3d at 562 (quoting Baze, 553 U.S. at 49-50 (plurality opinion)). "That is, 'there must be a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment.' " Id. (quoting Baze, 553 U.S. at 50). "An inmate faces a 'heavy burden' to show that lethal injection procedures violate the Eighth Amendment." Id. at 562-63 (quoting Baze, 553 U.S. at 53).

In the lethal injection context, "the condemned inmate's lack of consciousness is the focus of the constitutional inquiry." Valle v. State, 70 So. 3d 530, 539-40 (Fla. 2011). As we explained in Lightbourne, "[i]f the inmate is not fully unconscious when either pancuronium bromide or potassium chloride [the second and third drugs in the protocol at that time] is injected, or when either of the

chemicals begins to take effect, the prisoner will suffer pain." 969 So. 2d at 351; see also Baze, 553 U.S. at 53 ("[F]ailing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride.").

Since Lightbourne, in which this Court approved the August 2007 protocol, Florida has changed the lethal injection protocol three times, substituting both the first drug and the second drug. In Valle, 70 So. 3d at 538, after the June 2011 lethal injection protocol changed the first drug from sodium thiopental to pentobarbital, we upheld the change to pentobarbital, holding that the defendant had failed to satisfy the "heavy burden" to demonstrate that Florida's lethal injection protocol violated the Eighth Amendment. In Pardo, 108 So. 3d at 565, after the September 2012 lethal injection protocol replaced pancuronium bromide with vecuronium bromide as the second drug, this Court again held that the defendant failed to meet the high burden of proof.

Most recently, in Muhammad, 2013 WL 6869010, at *4, the defendant challenged the latest 2013 lethal injection protocol, which changed the first drug from pentobarbital to midazolam, a drug that is described as "an FDA-approved drug routinely used as a pre-anesthetic sedative and as an anesthetic in minor surgical procedures." In that case, the defense expert "Dr. Heath agreed that the

dosage of midazolam hydrochloride called for in the protocol, if properly administered together with adherence to the procedures for determining consciousness, will result in an individual who is deeply unconscious and who would feel no pain when the remaining drugs are administered." Id. at *10. We rejected the defendant's "invitation to presume that the DOC will not act in accordance with its lethal injection procedures adopted by the DOC." Id. Based on the evidence submitted at the evidentiary hearing in that case, we agreed with the trial court that the defendant had not demonstrated that the use of midazolam is " 'sure or very likely' to cause serious illness or needless suffering and give rise to 'sufficiently imminent dangers' under the standard set forth in Baze." Id. at *11. Subsequently, in Chavez v. State, 39 Fla. L. Weekly S73, 2014 WL 346026, at *4 (Fla. Jan. 31, 2014), this Court denied the defendant's request for an evidentiary hearing because the claims were speculative and Chavez "failed to proffer any witnesses or evidence that he would present during an evidentiary hearing."

Howell contends that, despite this Court's established precedent as to the proper standard to apply to an Eighth Amendment challenge to the lethal injection protocol, this Court should recede from this precedent and instead impose a burden-shifting standard where the State—rather than the defendant—must make a preliminary showing that it is not violating the Eighth Amendment when it changes its lethal injection protocol and adopts a new chemical not previously used. As this

Court has repeatedly recognized, however, the Florida Constitution requires this Court to evaluate "whether lethal injection is unconstitutional 'in conformity with decisions of the United States Supreme Court.' " Pardo, 108 So. 3d at 562 (quoting art. I, § 17, Fla. Const.). As our precedent as detailed above makes clear, we apply—and have consistently applied to a claim like this one that is based on a change in the lethal injection protocol—the standard set forth by the United States Supreme Court in Baze. See Valle, 70 So. 3d at 539; Pardo, 108 So. 3d at 562. Accordingly, we reject Howell's suggestion that we should recede from our precedent, because such a suggestion is contrary to the Florida Constitution.

**Use of Midazolam**

Next, Howell contends that the use of midazolam as the first drug in the 2013 lethal injection protocol violates the Eighth Amendment, both based on an as-applied challenge and in general. Howell's first series of challenges to midazolam, as presented in his amended third successive motion for postconviction relief, were to the overall use of midazolam in general, in which Howell alleged: (1) that the slower acting midazolam would not sufficiently render an inmate unconscious before the administration of the last two drugs; (2) that in the past three out of four executions, midazolam failed to render the inmate unconscious prior to the administration of the remaining lethal injection drugs; and (3) the consciousness check portion of the protocol is insufficient or occurs too close in time after the

administration of midazolam.  In his as-applied challenge, supported by a detailed expert affidavit and report, Howell contended that he has a mental condition that creates an increased risk that he will suffer a paradoxical reaction to midazolam, meaning that midazolam will have the opposite effect on him that it has on others and thus will not properly anesthetize him.  Specifically, he alleged that people with a history of bipolar disorder, brain damage, PTSD, and extreme anxiety—like he has—have an increased risk of suffering paradoxical reactions.

The postconviction court initially summarily denied Howell's claim pertaining to the use of midazolam, but this Court relinquished jurisdiction for an evidentiary hearing regarding whether the inclusion of midazolam in the 2013 protocol violates the Eighth Amendment as it applies to Howell.  We specifically stated as follows:

> [W]e conclude based on Dr. David Lubarsky's expert report and affidavit, as well as the allegations in Howell's amended 3.851 motion, that Howell has raised a factual dispute, not conclusively refuted, as to whether the use of midazolam, in conjunction with his medical history and mental conditions, will subject him to a "substantial risk of serious harm."  Baze v. Rees, 553 U.S. 35, 50 (2008) (plurality opinion).
>
> Accordingly, we hereby temporarily relinquish jurisdiction to the Circuit Court of the Second Judicial Circuit, Jefferson County to hold an evidentiary hearing on Claim II of Howell's amended third successive motion for postconviction relief regarding the use of midazolam as an anesthetic in the amount prescribed by Florida's protocol and the problems raised as to the consciousness check.  This includes factual allegations raised by Dr. Lubarsky in his expert report and affidavit concerning this discrete issue alone.  We further direct the DOC to produce correspondence and documents it has received

from the manufacturer of midazolam concerning the drug's use in executions, including those addressing any safety and efficacy issues.

On relinquishment, the postconviction court held a two-day evidentiary hearing, and after carefully considering the testimony presented, ultimately denied Howell's claim. As it pertained to Dr. Lubarsky, the defense's eminent anesthesiology expert, the postconviction court summarized his testimony as follows:

> Regarding midazolam, Dr. Lubarsky testified that it is a sedative that will induce unconsciousness within 1-2 minutes. However, it has no analgesic or pain relieving properties. According to Dr. Lubarsky, it would not be used in a clinical setting as a sole anesthetic agent. Rather, he stated it is used in a clinical setting to calm pre-operative anxiety and to induce amnesia of the event. Dr. Lubarsky testified that in the low doses used in a clinical setting midazolam would not keep a person unconscious in the face of noxious stimuli.
>
> Addressing the efficacy of midazolam in the lethal injection protocol, Dr. Lubarsky testified that "there is no evidence to suggest that it is useful as a sole agent to maintain a state of general anesthesia while the rest of the protocol is continued." When asked whether the high dose used in the protocol might make a person insensate to noxious stimuli even though the clinical dose would not, he answered "my theory is that it is not." He went on to add that any conclusion regarding this was "conjecture" because nobody has tested such high doses of midazolam in humans. He based his conclusion on "extrapolation" from animal testing data, saying his conclusions were the most reasonable based on the animal data. Dr. Lubarsky testified that there is a ceiling effect associated with midazolam, where after a certain point additional amounts of the drug may not provide additional effect and [it's] "potentially possible" that someone may wake up. He also testified that midazolam, even in high doses, is "not likely" to cause death. However, he did acknowledge that others have come to differing conclusions on this point.
>
> Dr. Lubarsky also offered his opinion testimony on whether [recently executed inmates] Mr. Happ and Mr. Muhammad became conscious upon administration of the second and third drugs. He

- 14 -

indicated that the movement [reported during these executions] was likely a sign of consciousness. When asked whether any movement by Mr. Happ could have been involuntary he answered "I don't know of any reason why that would occur." However, he acknowledged that administration of potassium chloride [the third drug in the protocol] can cause involuntary muscle movement. Dr. Lubarsky suggested that these involuntary muscle movements are part of the reason for the vecuronium bromide paralytic agent [the second drug in the protocol]. He then suggested, with no apparent basis, that movement after administration of the paralytic would only be expressive of consciousness as opposed to these involuntary muscle contractions.

In contrast, the postconviction court considered and evaluated the testimony offered by the State's medical doctor, Dr. Mark Dershwitz, who came to different conclusions regarding the use of midazolam:

> Regarding the lethal injection protocol, Dr. Dershwitz testified that the 500 mg dose of midazolam would render the inmate unconscious and insensate. Unlike some classes of drugs, midazolam does not put the brain completely asleep but does [affect] the center of consciousness in the brain such that the person is "unresponsive or oblivious to all external stimuli." On cross examination Dr. Dershwitz further explained that midazolam, even at high doses, will not cause burst suppression to manifest on an EEG. Nonetheless, burst suppression is not necessary for the person to be insensate to all noxious stimuli when unconscious under high doses of midazolam. Burst suppression is necessary in other classes of drugs, but not midazolam.
>
> Dr. Dershwitz is familiar with paradoxical reactions that occur in benzodiazepines. They typically happen in low doses when the drug is given to calm anxiety, but the opposite result occurs. A patient experiencing a paradoxical reaction would not appear to be unconscious when given a graded noxious stimuli test. If the person did not respond to the graded noxious stimuli, they would in fact be insensate. On cross examination he clarified that "if the midazolam produces unconsciousness and unresponsiveness to external stimuli, there can be no subsequent paradoxical reaction."

Regarding movement while unconscious, Dr. Dershwitz explained that movement is not necessarily purposeful when under general anesthesia. He testified that such movement happens not infrequently in the clinical setting. He added that "movement and consciousness do not necessarily have anything to do with each other under the general anesthetic state."

After weighing all of the testimony, including from Dr. Roswell Lee Evans, a pharmacologic expert presented by the State, and Timothy Cannon, who is the DOC employee that performs the consciousness check, the postconviction court made the following findings of fact:

The expert evidence presented by Defendant and the State conflict. Having weighed the evidence presented, the Court finds that midazolam is used in clinical settings as a sedative in combination with another drug which has analgesic properties. The drugs acting together put the patient into a plane of anesthesia where he or she is unconscious and insensate. Midazolam is rarely used alone for anesthesia [in] clinical settings, though Dr. Dershwitz has used it alone in a clinical setting when more preferred drugs were unavailable.

However, an execution is not a typical clinical setting. The Court finds that the 500 mg dose of midazolam is sufficient to render the condemned defendant both unconscious and insensate prior to administration of the second and third drug. Dr. Lubarsky's testimony that a 500 mg dose would be no different than a 20 mg dose is not credible. Additionally, burst suppression on the EEG is not necessary for the inmate to be sufficiently anesthetized so as to not feel the pain associated with administration of the second and third drugs. Thus, if the inmate's consciousness is properly verified, he will not become sensate or conscious even in the presence of the noxious stimuli of the vecuronium bromide and potassium chloride.

Paradoxical reactions to midazolam may occur in the general population and with benzodiazepines generally may occur more frequently in those with mental health diagnoses and traumatic brain injuries. However, such reactions typically manifest as overt

- 16 -

consciousness. If a paradoxical reaction occurs it will rarely manifest as consciousness that appears to be unconsciousness.

Florida's three-part graded consciousness check will identify those condemned inmates who are not unconscious. The Court credits the testimony of Dr. Evans that the midazolam will begin to work immediately. Midazolam reaches [its] maximum efficacy approximately 10 minutes after administration, but will render the condemned defendant unconscious and insensate much sooner. Thus, if the inmate does not react to the noxious stimuli of the consciousness check, he will almost certainly not perceive or feel pain from the noxious stimuli of the second and third drugs. Additionally, if the condemned is sufficiently unconscious to be insensate to the noxious stimuli of the consciousness test, he will not have a subsequent paradoxical reaction which would render him sensate to the noxious stimuli of the second and third drugs.

The reported movements of Mr. Happ and eye lid opening of Mr. Muhammad do not alter these findings. Defendant has not shown that these movements were voluntary and in response to the noxious stimuli of the second and third drugs. Dr. Lubarsky's theory to the contrary is too speculative to draw such a conclusion. This is particularly true in the face of other very reasonable testimony that breathing difficulty, imperceptible to the condemned, could still cause involuntary movement. Additionally, Dr. Dershwitz testified and this Court finds credible that it is not uncommon to see some movement from patients even in a surgical plane of anesthesia.

The postconviction court then denied relief, concluding that Howell failed to meet his heavy burden to show that midazolam will not render him unconscious and insensate when the second and third drugs are administered.

Howell raises two main arguments to challenge the postconviction court's denial of this claim—both of which attack the weight that the postconviction court gave to the State's experts. First, Howell contends that the postconviction court erred in relying on the State's experts' testimony that a 500 mg dose of midazolam

places the recipient in a coma because the State's experts also acknowledged that a person in a coma should not move like recently executed inmates Happ and Muhammad did after the administration of midazolam. Second, Howell argues that the postconviction court erred in relying on Dr. Dershwitz's statement that burst suppression on the EEG is not necessary to ensure that an inmate will not feel pain during lethal injection because Dr. Dershwitz previously wrote an article that stated a humane execution required a deep level of unconsciousness equal to burst suppression.

As this Court has recognized repeatedly, in order to prevail on an Eighth Amendment challenge, a claimant must show that "the conditions presenting the risk must be 'sure or very likely to cause serious illness and needless suffering,' and give rise to 'sufficiently imminent dangers.' " Pardo, 108 So. 3d at 562 (quoting Baze, 553 U.S. at 49-50). In other words, "there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.' " Id. (quoting Baze, 553 U.S. at 50). This heavy burden is borne by the defendant—not the State.

A review of Howell's claim shows that Howell is attempting to satisfy his heavy burden by pointing to two alleged weaknesses in the State's experts' testimony. However, this is flipping the burden on its head, imposing the burden

- 18 -

on the State to show that an Eighth Amendment violation has not occurred. This is not the standard.

In terms of establishing an Eighth Amendment violation, Howell rests on Dr. Lubarsky's testimony. A careful review of Dr. Lubarsky's testimony, however, demonstrates that Howell has failed to meet his burden. While Dr. Lubarsky discussed his vast medical knowledge as to using midazolam for surgeries, he testified regarding situations where patients are given 50 mg of midazolam, instead of the 500 mg dose as provided in Florida's lethal injection protocol. When asked questions as to the effects of 500 mg on a person, Dr. Lubarsky had to speculate as to the results. Further, Dr. Lubarsky recognized that he did not have any experience using midazolam as the sole drug in a major surgery. In contrast to this testimony, the State called Dr. Dershwitz, who has used midazolam as "the first and primary drug to induce anesthesia" in neurosurgeries during a drug shortage. While Dr. Dershwitz had experience with only a 50 mg dose, he was able to testify based on his direct experience, where a 50 mg dose prevented his patients from perceiving the noxious stimuli associated with neurosurgery, that it was clear a 500 mg dose would prevent the recipient from being "able to perceive any noxious stimuli whatsoever." The postconviction court credited his testimony in its order.

In addition, the State presented evidence that DOC added an additional test to ensure unconsciousness, where the person undertaking the consciousness check

added a painful pinch test of the trapezius muscle. In fact, Dr. Lubarsky recognized that before current technology provided other means of testing for unconsciousness, he would similarly use a clamp to pinch a patient's skin to determine whether the patient was able to feel pain. Dr. Dershwitz likewise testified that he would use a painful pinch as the noxious stimuli to ensure that a person was unconscious prior to surgery. Accordingly, because the consciousness check as testified to by the DOC employee and found by the postconviction court will ensure that Howell is unable to perceive any noxious stimuli, Howell has not shown that midazolam fails to sufficiently render an inmate unconscious and insensate before the administration of the last two drugs or that the consciousness check portion of the protocol is insufficient.

Moreover, as to Howell's as-applied challenge concerning the possibility of paradoxical reactions, he failed to establish that even if he reacted to midazolam in an unexpected manner, he would undergo needless suffering. As Dr. Dershwitz testified, if a patient was experiencing a paradoxical reaction, the patient would be unable to pass a noxious stimuli test. In contrast, if the patient passed a graded noxious stimuli test in a state of unconsciousness by not responding to the test, the patient would be insensate. Howell failed to present any evidence at all to show that if he did experience a paradoxical reaction to midazolam, he would still pass

the graded noxious stimuli test that DOC employees undertake to ensure unconsciousness.

Accordingly, after a complete review of the record, we affirm the postconviction court's well-reasoned order and deny the claim that use of midazolam violates the Eighth Amendment.

### Forced Administration of Vecuronium Bromide

In the next claim that we address, Howell contends that the forced administration of vecuronium bromide violates his Eighth Amendment rights and his Fourteenth Amendment rights. This Court already rejected the Eighth Amendment challenge to the use of vecuronium bromide. See Pardo, 108 So. 3d at 564-65. However, Howell raises a new allegation, contending that the forced administration of vecuronium bromide violates his Fourteenth Amendment rights, citing Sell v. United States, 539 U.S. 166 (2003). In Sell, the United States Supreme Court addressed the issue of when the government can involuntarily medicate a person for the sole purpose of rendering that person competent to stand trial. Id. at 169. In order to meet this standard, the government must satisfy a four-prong test, which Howell contends that the State cannot meet in this case.

However, a review of the four factors in Sell shows that this holding applies only to the situation presented in that case—involuntarily medicating a person for purposes of trial. Specifically, the Sell test requires a showing that "(1) important

government interests must be at stake, (2) involuntary medication must significantly further the state interests in assuring a fair and timely trial, (3) involuntary medication must be necessary to further the state interests, and (4) administration of the medication must be 'medically appropriate, i.e., in the patient's best medical interest in light of his medical condition.' " United States v. Diaz, 630 F.3d 1314, 1319 (11th Cir. 2011) (quoting Sell, 539 U.S. at 180-81). None of the chemicals used in lethal injection would ever be in a patient's best medical interest. While Howell attempts to point to another case that applied the holding of Sell in a lethal injection context, that case did not involve a challenge to the forced administration of the drugs used to extinguish a life. See Singleton v. Norris, 319 F.3d 1018, 1024 (8th Cir. 2003) (considering a due process challenge to forced administration of medication where the state's sole purpose was to restore a defendant's competency for execution). Accordingly, we decline to extend application of the holding of Sell to these circumstances.

**Cross-Examination of Dr. Dershwitz**

In the final claim we address, Howell asserts that the postconviction court erred in denying his request to strike a witness's testimony because Dr. Dershwitz refused to answer questions, including in the following areas: (1) whether Dr. Dershwitz made prior statements in an article where he stated that it was "advisable" to achieve a deep level of coma equal to burst suppression before

- 22 -

injecting the second and third drugs of a lethal injection protocol; (2) whether midazolam is different from thiopental and other barbiturates; and (3) when discussing the fact that another drug used in general anesthesia had almost no EEG effects, he refused to name the medication because he did not want his testimony to be seen as giving advice on how to craft a lethal injection protocol.

As an initial observation, the portions to which Howell points all involved Dr. Dershwitz's statements that he would be unable to answer the questions because that would violate his ethical obligations. Specifically, Dr. Dershwitz informed the court and the parties that he was unable to discuss protocols used by other states or used by this state in the past and that he was unable to compare medications or provide testimony that would assist in better crafting a lethal injection protocol. When defense counsel objected to this limitation, the postconviction court pointed out that Howell's expert likewise was unable to answer the same types of questions based on the same ethical considerations and the postconviction court did not force Dr. Lubarsky to answer those questions. The court recognized that the reason Dr. Dershwitz was unable to answer so many of the questions was based on the specific questions presented, because defense counsel was asking the expert to draw comparisons and essentially offer a particular recommendation as to drugs to be used in lethal injection protocols. The postconviction court suggested that defense counsel should phrase the questions

differently and focus on the effects of midazolam—as opposed to other protocols not at issue.

A review of the testimony from the evidentiary hearing demonstrates that defense counsel was able to effectively cross-examine Dr. Dershwitz. To the extent that Dr. Dershwitz made prior statements that could have been considered contrary to his testimony at the hearing, these differences were presented to the trier of fact. To the extent that defense counsel was requesting information as to what other drugs would be better and more effective in triggering a burst suppression, neither of the experts was able to provide this information. Additionally, testimony concerning other drugs was not relevant to showing the effects of midazolam and whether that drug, given in the dose set forth in the 2013 protocol, would render an inmate insensate.

Thus, the postconviction court did not err in failing to strike Dr. Dershwitz's testimony.

## CONCLUSION

In accordance with our analysis above, we affirm the postconviction court's denial of Howell's amended third successive rule 3.851 motion for postconviction relief. No motion for rehearing will be entertained by this Court. The mandate shall issue immediately.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

An Appeal from the Circuit Court in and for Jefferson County,
     Angela Cote Dempsey, Judge - Case No. 1992-CF-22

Sonya Rudenstine, Gainesville, Florida; Michael Ufferman of Michael Ufferman Law Firm, P.A., Tallahassee, Florida; Kathleen Harris of Arnold & Porter LLP, London, EC2N 1HQ, United Kingdom; Gwendolyn Ostrosky, Arnold & Porter, LLP, Los Angeles, California; and Mara Senn, Peggy Otum, and Michael Tye of Arnold & Porter LLP, Washington, DC,

     for Appellant

Pamela Jo Bondi, Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, Florida,

     for Appellee

Andrea Flynn Mogensen of The Law Office of Andrea Flynn Mogensen, P.A., Sarasota, Florida,

     for Amicus Curiae The First Amendment Foundation