# Supreme Court of Florida

_____

No. SC14-398
_____

**ROBERT L. HENRY,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[March 14, 2014]

PER CURIAM.

Robert Henry is a prisoner under sentences of death for whom a death

warrant has been signed and execution set for March 20, 2014.  In 1988, Henry

was convicted of the first-degree murders of Phyllis Harris and Janet Thermidor,

armed robbery with a deadly weapon, and arson.  Henry now appeals the denial of

his second successive motion for postconviction relief, filed under Florida Rule of

Criminal Procedure 3.851; the denial of his motion to declare section 922.052,

Florida Statutes (2013), unconstitutional; and his motion to dismiss his death

warrant.  For the reasons explained below, we affirm the postconviction court's

denial of relief. In addition, we deny Henry's motion for a stay of execution, filed March 12, 2014.

## I. BACKGROUND

On November 1, 1987, Henry tied up his coworkers Harris and Thermidor, hit each of them on the head with a hammer, and set them on fire. Harris was found dead, but Thermidor survived until the next day and identified Henry as the perpetrator. When interviewed by law enforcement officers, Henry initially claimed that he was forced to attack his coworkers by unknown robbers but later confessed that he acted alone. Henry v. State, 613 So. 2d 429, 430-31 (Fla. 1992).

The jury recommended a death sentence for the murder of Harris by a vote of eight to four and for the murder of Thermidor by a vote of nine to three. The trial court imposed a life sentence for the armed robbery, a life sentence for the arson, and a death sentence for each murder. In imposing death sentences for both murders, the trial court concluded that five aggravating factors were applicable to each murder: (1) the murder was committed during the commission of a robbery and arson; (2) the murder was committed to avoid arrest; (3) the murder was committed for pecuniary gain; (4) the murder was especially heinous, atrocious, or cruel (HAC); and (5) the murder was committed in a cold, calculated, and premeditated manner (CCP). Despite Henry's decision to waive the presentation of mitigating evidence, the trial court also found two mitigating factors: (1) Henry

had no significant prior criminal history; and (2) Henry served in the United States Marine Corps.  State v. Henry, No. 88-18628 CF 10 (Fla. 17th Jud. Cir. Ct. order filed Nov. 9, 1988).

On direct appeal, Henry argued that: (1) the trial court erred in partially denying Henry's motion to suppress his statements; (2) the trial court erred in denying Henry's motion to suppress Thermidor's statement; (3) the trial court erred by failing to give an instruction on duress; (4) a discovery violation occurred; (5) the prosecutor made improper comments; (6) Florida's rule requiring a defendant to forego presenting witnesses to preserve first and last arguments is unconstitutional; (7) the presentation of victim impact evidence was improper; (8) the trial court erred by admitting irrelevant and cumulative photographs; (9) the State presented false testimony; (10) the trial court erred by allowing the State to argue alternative theories of premeditated and felony murder; (11) the trial court applied the wrong standard of proof to the mitigating factors and erred by allowing Henry to waive the presentation of mitigating evidence; (12) the trial court gave improper penalty phase instructions; (13) the aggravating factors were not established beyond a reasonable doubt or were unconstitutional, and the trial court considered nonstatutory aggravating factors; (14) Florida's death penalty scheme is unconstitutional; (15) Henry's right to be present during all stages of the trial was violated; (16) the presentence investigation report violated Henry's rights under the

Confrontation Clause of the United States Constitution; and (17) the trial court erred by departing from the sentencing guidelines when sentencing Henry on the arson and robbery convictions.

In Henry v. State, 586 So. 2d 1033, 1034-35 (Fla. 1991), this Court concluded that each of Henry's claims was without merit or unpreserved and affirmed the convictions and sentences. That decision was vacated, however, by the United States Supreme Court in Henry v. Florida, 505 U.S. 1216 (1992). The Supreme Court remanded Henry's case to this Court for further consideration in light of Espinosa v. Florida, 505 U.S. 1079 (1992) (concluding that the standard jury instruction given on the HAC aggravating factor was unconstitutionally vague), and Sochor v. Florida, 504 U.S. 527 (1992) (concluding that the defendant failed to preserve for appeal his argument that the standard jury instruction given on the HAC aggravating factor was unconstitutional). On remand, this Court issued a revised opinion and again affirmed Henry's convictions and sentences. This Court explained that although Florida's former standard jury instruction on the HAC aggravating factor had been determined to be unconstitutional, in Henry's case, the trial court gave an expanded instruction that was not unconstitutionally vague. Henry, 613 So. 2d at 434.

In 1998, Henry filed an amended initial motion for postconviction relief, raising fifty-one claims, which was denied by the postconviction court. Henry

appealed and filed a petition for a writ of habeas corpus. This Court affirmed the denial of Henry's postconviction motion; determined that the postconviction court did not commit reversible error by limiting the evidentiary hearing to the deficiency prong of Strickland v. Washington, 466 U.S. 668 (1984); and concluded that "only the postconviction claims that were considered at the evidentiary hearing merit discussion." Henry v. State, 937 So. 2d 563, 568 (Fla. 2006). Those claims were: (1) trial counsel was ineffective for failing to develop a mitigation strategy that emphasized Henry's drug addiction; (2) trial counsel was ineffective for failing to follow Henry's initial psychological screening with a full mental health mitigation evaluation; and (3) Henry's waiver of the presentation of mitigating evidence was not knowingly and intelligently made due to trial counsel's inadequate penalty phase investigation. Id. at 571-75. This Court also denied Henry's habeas petition, which alleged that: (1) appellate counsel failed to raise numerous meritorious issues due to the page number limitation imposed on appellate briefs; (2) appellate counsel failed to raise claims on direct appeal concerning the record being incomplete and the need for a change of venue; and (3) the constitutionality of the indictment must be revisited in light of Ring v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New Jersey, 530 U.S. 466 (2000).

In 2003, Henry filed a motion for postconviction DNA testing under Florida Rule of Criminal Procedure 3.853. That motion was denied in October 2007, and

Henry failed to file a timely appeal. In 2008, Henry filed a motion for belated appeal, which was treated as a petition for a writ of habeas corpus. This Court relinquished jurisdiction to the circuit court to determine if a belated appeal was warranted. The circuit court concluded that Henry was not entitled to a belated appeal, and in 2010, this Court denied Henry's petition. Henry v. State, 43 So. 3d 690 (Fla. 2010) (Table).

In 2007, Henry filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Florida. Henry raised six claims: (1) the trial court erred by admitting Henry's statements; (2) trial counsel was ineffective for failing to attach the search warrant used to obtain incriminating evidence; (3) the trial court erred by admitting victim Thermidor's statement; (4) the trial court erred by failing to allow DNA testing of a beer can found at the crime scene; (5) appellate counsel was ineffective; and (6) Henry's death sentences are excessive. While his habeas petition was pending, Henry filed a motion to hold his habeas petition in abeyance in order to litigate some of his claims in state court, a pro se supplemental motion to hold his petition in abeyance, and a motion to stay. On March 19, 2009, the federal court issued an order denying Henry's motions. The federal court concluded that several of Henry's claims had not been exhausted in the state courts and that Henry failed to establish the requirements for a stay and abeyance to finish litigating those claims. The federal court thus ruled that unless

Henry withdrew his unexhausted claims by April 1, 2009, his habeas petition would be dismissed. Henry v. McDonough, No. 07-61281-CIV-HUCK, 2009 WL 762219 (S.D. Fla. Mar. 19, 2009).

In 2012, Henry filed a pro se successive motion for postconviction relief, alleging that newly discovered evidence will show that his chronic drug addiction is now scientifically recognized as a brain disease. The postconviction court summarily denied the motion, and this Court affirmed the denial. Henry v. State, 125 So. 3d 745, 752 (Fla. 2013).

Most recently, following the signing of his death warrant on February 13, 2014, Henry filed a second successive postconviction motion. Henry alleged that Florida's lethal injection protocol is unconstitutional because: (1) midazolam hydrochloride (midazolam) should not be used as the first drug of the protocol; (2) due to Henry's specific health concerns, the use of midazolam creates a substantial risk of harm to him; (3) the consciousness check in the protocol is inadequate; (4) the execution team is inadequately trained and might not follow the protocol; (5) a one-drug protocol does not pose the same risk of causing pain as the current three-drug protocol. Henry later amended his motion to add more detail regarding his as-applied challenge to Florida's lethal injection protocol and to add a claim that Henry's death sentences violate the Eighth Amendment of the United States Constitution because the jury recommendations were nonunanimous. In addition,

Henry filed: (1) a motion arguing that section 922.052—as amended by the Timely Justice Act (Act), ch. 2013-216, §§ 1-9, at 2596-2613, Laws of Fla.—is both facially unconstitutional and unconstitutional as applied to Henry; and (2) a motion to dismiss his death warrant, asserting that the warrant was fatally defective for not stating a time of execution. On February 26, 2014, the postconviction court denied Henry's amended motion for postconviction relief, his motion to declare section 922.052 unconstitutional, and his motion to dismiss the death warrant.

Regarding the first part of Henry's as-applied challenge, the postconviction court reasoned that Henry's claim that due to his mental health, the use of midazolam would create a substantial risk of serious harm was insufficiently pleaded. The postconviction court explained that Henry's motion did not allege what mental health disorder Henry suffers from or how, as a result of that disorder, Henry would react to an injection of midazolam.

The postconviction court also rejected the second part of Henry's as-applied challenge—his claim that due to his hypertension, high cholesterol level, and coronary artery disease, the use of midazolam creates a substantial risk of serious harm. The postconviction court reasoned that while Henry presented an affidavit and an amended affidavit by Dr. Zivot that supported Henry's allegations that the injection of midazolam may cause Henry to experience an acute coronary event, Henry did not proffer any evidence that he "will be conscious at the onset of the

acute coronary event" or "that midazolam will not have the intended effect of rendering Defendant unconscious and insensate, and cause him to experience an acute coronary event while conscious." State v. Henry, No. 87-018628CF10A at 10 (Fla. 17th Jud. Cir. Ct. order filed Feb. 26, 2014).

The postconviction court concluded that each of Henry's remaining challenges to Florida's lethal injection protocol should be denied because the claims have been rejected by this Court in Howell v. State, 39 Fla. L. Weekly S89 (Fla. Feb. 28, 2014), cert. denied, 2014 WL 727245 (2014), and Muhammad v. State, 38 Fla. L. Weekly S919 (Fla. Dec. 19, 2013), cert. denied, 134 S. Ct. 894 (2014). And citing Kimbrough v. State, 125 So. 3d 752 (Fla.), cert. denied, 134 S. Ct. 632 (2013), and Mann v. State, 112 So. 3d 1158 (Fla. 2013), the postconviction court denied Henry's claim that his death sentences are unconstitutional as a result of nonunanimous jury recommendations.

In a separate order, the postconviction court denied Henry's motion to declare section 922.052 unconstitutional. The postconviction court concluded that because the Office of Executive Clemency began Henry's clemency proceeding before the passage of the Act, Henry's motion should be denied under Muhammad, in which this Court declined to reach Muhammad's constitutional challenge to section 922.052. In a third order, the postconviction court denied without

discussion Henry's motion to dismiss his death warrant.  <u>State v. Henry</u>, No. 87-018628CF10A (Fla. 17th Jud. Cir. Ct. order filed Feb. 26, 2014).

Henry appealed in this Court, raising three claims.  Henry argued that the postconviction court erred by denying his motion to declare section 922.052 unconstitutional, denying his motion to dismiss his death warrant, and summarily denying his as-applied challenge to the lethal injection protocol.

After considering Henry's argument and the State's response, on March 6, 2014, this Court relinquished jurisdiction to the postconviction court in order to conduct an evidentiary hearing on Henry's as-applied challenge to Florida's lethal injection protocol.  On March 10, 2014, the postconviction court held an evidentiary hearing, during which both Henry and the State called medical experts to testify about the likely effect on Henry of intravenous administration of 500 milligrams of midazolam.  On March 11, 2014, the postconviction court again denied Henry's as-applied challenge.

In addition to his claims on appeal regarding his motion to declare section 922.052 unconstitutional and his motion to dismiss the death warrant, Henry now appeals the denial of his claim that Florida's lethal injection protocol is unconstitutional as applied to him and has filed a motion for stay of execution.  For the reasons expressed below, we affirm the postconviction court's denial of relief and deny Henry's motion for a stay of execution.

- 10 -

## II. ANALYSIS

### A. Motion to Declare Section 922.052 Unconstitutional

In his first issue on appeal, Henry argues that section 922.052, as amended by the Act, violates the Separation of Powers Clause of the Florida Constitution, art. II, § 3, Fla. Const., by limiting the Governor's discretion to grant clemency and sign death warrants. The determination of a statute's constitutionality is a question of law subject to de novo review. See Graham v. Haridopolos, 108 So. 3d 597, 603 (Fla. 2013). In this case, the postconviction court did not err by relying on Muhammad—in which this Court declined to reach a similar constitutional challenge to section 922.052—to deny Henry's motion.

In his initial brief, Henry concedes that his clemency proceeding began in February 2012, whereas the Florida Legislature did not pass the Act until April 2013, and the Governor did not sign it into law until June 2013. As in Muhammad's case, after the passage of the Act, the Governor could have chosen to continue, rather than complete, Henry's clemency proceeding. Furthermore, after signing a death warrant, the Governor retains statutory authority to stay Henry's execution if he chooses to do so. See § 922.06(1), Fla. Stat. (2013) ("The execution of a death sentence may be stayed only by the Governor or incident to an appeal."). Based on the foregoing, as in Muhammad's case, this Court cannot conclude that Henry's "death warrant would not have been signed but for the Act."

Muhammad, 38 Fla. L. Weekly at S925.  Thus, the postconviction court did not err in denying Henry's motion to declare section 922.052 unconstitutional.

## B.  Motion to Dismiss Death Warrant

In his second issue on appeal, Henry contends that the postconviction court erred by denying his motion to dismiss his death warrant.  Henry asserts that the plain language of sections 922.052(2)(b) and 922.052(3) requires the time of execution to be "designated in the warrant" and that his execution cannot proceed because the warrant in his case does not designate a time of execution.  A trial court's ruling on a motion to dismiss and the interpretation of a statute are both legal questions subject to de novo review.  See Jackson v. Shakespeare Found., Inc., 108 So. 3d 587, 592 (Fla. 2013); Tasker v. State, 48 So. 3d 798, 804 (Fla. 2010).  The postconviction court did not err in denying the motion to dismiss.

On February 13, 2014, Governor Scott signed Henry's death warrant.  The Governor sent a document titled "Death Warrant" to Warden Palmer along with a cover letter.  While the "Death Warrant" did not specify a time of execution, the cover letter stated: "I have designated the week beginning at 12:00 noon on Tuesday, March 18, 2014, through 12:00 noon on Tuesday, March 25, 2014, for the execution.  I have been advised that you have set the date and time of execution for Thursday, March 20, 2014, at 6:00 p.m."  This cover letter also was sent to Chief Justice Ricky Polston of the Florida Supreme Court, Chief Judge Peter

Weinstein of the Seventeenth Judicial Circuit, Secretary Michael Crews of the

Florida Department of Corrections, Julia McCall of the Office of Executive

Clemency, Assistant Deputy Attorney General Carolyn Snurkowski, Henry, and

Henry's counsel. Despite the clear time designation in the cover letter, Henry

contends that his execution cannot proceed because the time was not designated in

the document actually titled "Death Warrant."

Henry's motion to dismiss his warrant was properly denied because section

922.052 does not grant death-sentenced inmates a right to challenge the

Governor's exercise of discretion in issuing death warrants. In Jarvis v. Chapman,

159 So. 282, 284 (Fla. 1934), this Court examined an inmate's petition for a writ of

habeas corpus alleging that executive branch officials failed to comply with a

statute requiring that "the copy of the record" of the inmate's conviction and

sentence be attached to the death warrant. This Court determined that the death-

sentenced inmate was not entitled to challenge whether the warrant complied with

the statute:

> We hold that he has no rights in regard to it. It is merely a
> ministerial function as to the carrying out of the sentence pronounced
> upon the petitioner. His legal rights are ended so far as that judgment
> is involved. He has no voice as to the day he is to be executed, nor
> when the executive warrant shall issue, nor whether the certified copy
> of the record supplied to the Governor contains matters or does not
> contain matters that do not relate to the record proper which is
> designed to show only that the court pronouncing the sentence had
> jurisdiction of the person and crime, that there was a trial, verdict, and

> judgment and sentence, and, in case of appellate proceeding, a copy of the mandate from the appellate court.

Id. at 289.  Similarly, in Tompkins v. State, 994 So. 2d 1072 (Fla. 2008), this Court concluded that a death-sentenced inmate could not challenge the Governor's issuance of a warrant or the timing of his execution.  Following the signing of his death warrant in 2008, Tompkins argued that because Governor Bush—who had signed a death warrant for Tompkins in 2001—"was required [by section 922.06(2)] to reschedule his execution within ten days of the lifting of the stay of execution," "Governor Crist lacked the authority to reset the execution in October 2008."  Id. at 1084.  This Court affirmed the summary denial of Tompkins' claim, reasoning that it was procedurally barred and, alternatively, that "there is no authority that supports a claim that section 922.06(2) either explicitly or implicitly provides criminal defendants with any enforceable rights and, specifically, a 'right' to a speedy execution."  Id.  Henry, like Jarvis and Tompkins, does not offer any authority to support his claim that his sentence should be delayed or commuted as a result of any noncompliance with a statute governing the issuance of a death warrant.

Moreover, when sections 922.052 and 922.06 are read as a whole, the Legislature clearly expresses an intent that a time designation in the warrant is not essential to carrying out the sentence.  See State v. Fuchs, 769 So. 2d 1006, 1009

(Fla. 2000) ("[S]tatutes which relate to the same or closely related subjects should be read in pari materia.").

Section 922.052(2)(b) states: "Within 30 days after receiving the letter of certification from the clerk of the Florida Supreme Court, the Governor shall issue a warrant for execution if the executive clemency process has concluded, directing the warden to execute the sentence within 180 days, <u>at a time designated in the warrant</u>." (Emphasis added.) Similarly, section 922.052(3) provides: "The sentence shall not be executed until the Governor issues a warrant, attaches it to the copy of the record, and transmits it to the warden, directing the warden to execute the sentence <u>at a time designated in the warrant</u>." (Emphasis added.) Section 922.052(4), however, explains that "[i]f, for any reason, the sentence is not executed during <u>the week designated</u>, the warrant shall remain in full force and effect and the sentence shall be carried out as provided in s. 922.06." (Emphasis added.) Section 922.06(2), in turn, provides:

> (a) If execution of the death sentence is stayed by the Governor, and the Governor subsequently lifts or dissolves the stay, the Governor shall immediately notify the Attorney General that the stay has been lifted or dissolved. Within 10 days after such notification, the Governor must set the new date for execution of the death sentence.
> (b) If execution of the death sentence is stayed incident to an appeal, upon certification by the Attorney General that the stay has been lifted or dissolved, within 10 days after such certification, the Governor must set the new date for execution of the death sentence.
> When the new date for execution of the death sentence is set by the Governor under this subsection, the Attorney General shall notify

- 15 -

the inmate's counsel of record of the date and time of execution of the death sentence.

When read in pari materia, these statutes provide that an inmate's execution time and date can be changed without directing the Governor to revise the existing warrant or to issue a new warrant. Thus, contrary to Henry's argument, the plain language of chapter 922 does not evince an intent by the Legislature that an execution should be barred on the basis that the time of execution is not designated in the warrant.

### C. As-Applied Challenge to Florida's Lethal Injection Protocol

In his third issue on appeal, Henry argues that the postconviction court erred in denying his claim that due to Henry's specific medical concerns, the use of midazolam as the first drug of the lethal injection process creates an unconstitutional risk of severe pain. "[M]ixed questions of law and fact that ultimately determine constitutional rights should be reviewed by appellate courts using a two-step approach, deferring to the trial court on questions of historical fact but conducting a de novo review of the constitutional issue." Connor v. State, 803 So. 2d 598, 605 (Fla. 2001). Again, the postconviction court did not err in denying Henry's claim.

Article I, section 17 of the Florida Constitution provides that "[a]ny method of execution shall be allowed, unless prohibited by the United States Constitution." Article I, section 17, further requires that its prohibition against excessive

punishment "shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution." We are therefore bound by the precedent of the United States Supreme Court regarding challenges to methods of execution.

The Supreme Court has held that to state a claim under the Eighth Amendment, a defendant must show that the state's lethal injection protocol is " 'sure or very likely to cause serious illness and needless suffering.' " Brewer v. Landrigan, 131 S. Ct. 445, 445 (2010) (quoting Baze v. Rees, 553 U.S. 35, 50 (2008) (plurality opinion)). "In other words, there must be a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." Howell, 39 Fla. L. Weekly at S92 (internal quotation marks omitted). "This heavy burden is borne by the defendant—not the State." Id.

At the March 10, 2014, evidentiary hearing, Henry called Dr. Joel Zivot, an Assistant Professor of Anesthesiology in Surgery and the Medical Director of the Cardiothoracic Intensive Care Unit at Emory University Hospital and a practicing anesthesiologist. Based on Florida Department of Corrections' medical records provided by Henry's counsel and an in-person examination of Henry, Dr. Zivot opined that Henry has "coronary artery disease of a significant nature." Dr. Zivot

- 17 -

then explained that if a person injected with midazolam is—like Henry—taking a diuretic to treat high blood pressure, that person's blood pressure will fall more than would the blood pressure of a person with normal blood pressure and could fall "quite dramatically." Dr. Zivot also testified that in a person with coronary artery disease, like Henry, "once the blood pressure falls and the coronary blood flow is reduced . . . almost instantaneously there can be the beginning of damage to a heart muscle [that] is experienced as pain or tightness or shortness of breath or pressure." Finally, Dr. Zivot testified that there is a substantial risk that the fall in blood pressure in Henry's case would occur before a loss of complete consciousness and that the coronary event would be experienced as pain.

In response, the State called Dr. Mark Dershwitz, a member of the Department of Anesthesiology and the Department of Biochemical and Molecular Pharmacology at the University of Massachusetts Medical School and a clinician at UMass Memorial Health Care. Dr. Dershwitz opined, to a reasonable degree of medical certainty, that an inmate injected with a massive dose of midazolam would be unconscious before any "hypothetical drop in blood pressure" occurred.

Regarding whether an injection of midazolam would cause a drop in blood pressure, Dr. Dershwitz testified that at the "usual[] doses for inducing general anesthesia, thirty, thirty-five, or even fifty milligrams, the drop in blood pressure is very mild if at all." Dr. Dershwitz then explained that any drop in blood pressure

from an injection of midazolam would not occur until after the recipient of the drug had lost consciousness. First, Dr. Dershwitz testified that because a fifty milligram dose would render a person "in the state of general anesthesia" such that "they could not perceive or process any sort of noxious stimuli," the initial 250-milligram dose required by Florida's lethal injection protocol would certainly result in unconsciousness. Second, Dr. Dershwitz explained that this unconsciousness would occur quickly. He testified that when midazolam is given intravenously, "[c]onsciousness will be lost after around twenty-five or thirty or thirty-five milligrams will actually have been delivered," which "would actually go in within the first couple of seconds," and that the "onset of the effect of [m]idazolam is usually quoted as around one to two minutes." Third, Dr. Dershwitz explained that any impact on a recipient's blood pressure from a large dose of midazolam does not happen as quickly as unconsciousness because "the action of [m]idazolam to drop the blood pressure is going to happen at the level of the vasculature, not anywhere closer to the heart or the brain." Dr. Dershwitz explained the course of midazolam through the body:

> Because, first of all, after the blood is pumped from the heart to the circulation, the brain receives literally the first amount of the blood pumped from the heart because of its proximity.
> And so once the brain will have received approximately twenty-five milligrams[,] the inmate will be unconscious.
> Now, for the blood pressure to fall, not only does the [m]idazolam need to be pumped far more distantly, especially to the lower extremities, but once it reaches there[,] it then has to start a

cascade of events to result in the relaxation of smooth muscle to cause the dilation of the blood vessels that would then result in a drop of blood pressure. And that does not happen instantly.

And so there is no plausible way that I could imagine that even if the [m]idazolam caused a drop in blood pressure[,] it would occur prior to the inmate losing consciousness.

The State also called Dr. Roswell Lee Evans, a doctor of pharmacy, who is a professor and dean at the Harrison School of Pharmacy at Auburn University. Dr. Evans testified that while he does not know what effect a 250- or 500-milligram dose of midazolam will have on a recipient's blood pressure, the relevant pharmaceutical literature indicates that midazolam—at a therapeutic dose—at most could cause a "reduction in blood pressure of about twenty percent," which "should not be of any particular danger"—regardless of the person's coronary health. Furthermore, Dr. Evans testified that the first part of the body to be affected by midazolam is the brain. He explained that "[w]ithin one to two minutes you are going to get a very significant effect on the central nervous system" and that the recipient of 250 milligrams of midazolam would "almost immediately" lose consciousness and not be able to feel pain. Dr. Evans concluded that after the initial injection of 250 milligrams of midazolam, Henry will not be conscious to experience the pain of any acute coronary event that may occur as a result of any reduction of blood pressure caused by the midazolam.

After considering this testimony and argument from the parties, the postconviction court denied Henry's as-applied challenge. The postconviction

court determined that Henry "did not meet the burden of showing that given his hypertension diagnosis, elevated cholesterol, and coronary artery disease, the use of midazolam in his case is 'sure or very likely to cause serious illness and needless suffering.' " State v. Henry, No. 87-018628CF10A at 13 (Fla. 17th. Jud. Cir. Ct. order dated Mar. 11, 2014) (quoting Brewer, 131 S. Ct. at 445). The postconviction court concluded that Henry did not demonstrate a substantial risk of serious harm from the use of midazolam in Florida's lethal injection protocol because the evidence established that even if Henry were to suffer an acute coronary event as a result of an injection of midazolam, he would be unconscious and unable to process the pain associated with a heart attack. Id. at 12.

The postconviction court's conclusion is supported by competent, substantial evidence. At the evidentiary hearing, Dr. Dershwitz testified that any drop in blood pressure from an injection of midazolam would not occur until after the recipient of the drug had lost consciousness. Dr. Dershwitz explained that because the midazolam affects blood pressure by relaxing the smooth muscle tissue of the peripheral blood vessels, an intravenous injection of midazolam will affect the brain, leading to unconsciousness, more quickly than it will affect blood pressure. Dr. Dershwitz also testified that once rendered unconscious by midazolam, a person "could not perceive or process any sort of noxious stimuli."

Because Henry has not shown a "substantial risk of serious harm," <u>Howell</u>, 39 Fla. L. Weekly at S92, he has not demonstrated that Florida's lethal injection protocol—as applied to him—violates the Eighth Amendment of the United States Constitution. Accordingly, the postconviction court did not err in denying his second successive postconviction motion.

## III. CONCLUSION

For the reasons stated above, we affirm the postconviction court's denial of Henry's second successive motion for postconviction relief, his motion to declare section 922.052 unconstitutional, and his motion to dismiss the death warrant. Additionally, we deny Henry's motion for a stay of execution. No motion for rehearing will be entertained by this Court. The mandate shall issue immediately.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

An Appeal from the Circuit Court in and for Broward County,
  Andrew L. Siegel, Judge - Case No. 87-018628ACF10A

Melodee A. Smith, Offices of Melodee A. Smith, Fort Lauderdale, Florida; and Kevin James Kulik of Kevin J. Kulik, PA, Fort Lauderdale, Florida,

  for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Consiglia Terenzio, West Palm Beach, Florida,

  for Appellee